669 P.2d 51

**Stanley P. ABRAMS,**
**Plaintiff/Appellee/Cross-Appellant,**

v.

**HORIZON CORPORATION, a Delaware**
**corporation,**
**Defendant/Appellant/Cross-Appellee.**

No. 16316–PR.

Supreme Court of Arizona,
In Banc.

June 16, 1983.

Rehearing Denied Sept. 13, 1983.

Miller & Pitt, P.C. by Gerald Maltz, Tucson, for plaintiff/appellee/cross-appellant.

Molloy, Jones, Donahue, Trachta, Childers & Mallamo, P.C. by Michael J. Meehan, Roger D. Smith, Tucson, for defendant/appellant/cross-appellee.

CAMERON, Justice.

We accepted Stanley P. Abrams' petition for review of the decision and opinion of the Court of Appeals in *Abrams v. Horizon Corporation,* 137 Ariz. 112, 669 P.2d 90 (No. 2 CA–CIV 4292, filed 7 October 1982). We have jurisdiction under Ariz. Const. Art. 6, § 5(3), A.R.S. § 12–120.24, and Rule 23, Arizona Rules of Civil Appellate Procedure, 17A A.R.S.

The issues we must resolve on appeal are:
1.  Was it proper to impose treble damages on Horizon Corporation for its failure to pay Abrams' commissions on Horizon Corporation sales?
2.  Was Abrams entitled to receive commissions on "Horizon Realty" sales?
3.  Was the award of attorney's fees proper?

The facts necessary to a determination of this appeal are as follows. Stanley P. Abrams was promoted to the position of vice president of sales of Horizon Corporation in 1975. He negotiated the terms of his employment with Sidney Nelson, president of Horizon Corporation, and on 1 June 1976 the parties executed a written employment contract drafted by Horizon Corporation's legal department. The contract provided that Abrams was to be in charge of "sales operations and/or such other duties as may be assigned to him by Company * * *." In return, Abrams was to be paid a base salary of $51,000 per year, plus commissions of one-half percent "on all home or land sales made by sales personnel under Abrams' supervision * * *." Commissions in any one year were limited to a maximum of $72,000. "Commissionable Sales Contracts" were defined in the agreement as bona fide sales contracts written "on properties of HORIZON." At the time of the contract, Horizon Corporation's principal business was subdividing and selling lots in its large land holdings in Arizona, New Mexico and Texas.

In order to facilitate sales, wholly owned subsidiaries were formed to perform certain support functions. One of these subsidiaries, Horizon Realty, resold properties of previous purchasers in order to create a resale market for its properties. Horizon Realty took listings on the properties and received broker's fees for the sales. The employees of Horizon Realty were all employees of Horizon Corporation, and were paid by Horizon Corporation. Abrams, in addition to his supervisory duties over Horizon Corporation sales, was also responsible for overseeing the sales of Horizon Realty. At the time of the contract, Horizon Realty sales constituted a relatively small portion of overall sales of the combined organization.

Shortly after Abrams became vice president of sales, because of legal challenges, it became imperative to the corporation to establish the intrinsic value of its properties through accelerated development. In order to establish the value of its new communi-

ties, and maintain a volume necessary to hold together the existing sales force, Abrams devised a new development program involving Horizon Realty. Large blocks of lots were sold to construction companies. These companies built houses on the lots, and listed the house and parcel combinations for resale through Horizon Realty. This program proved very successful, and at times revenues from Horizon Realty surpassed Horizon Corporation land sales.

From the time the contract was entered into, Abrams received commissions based only on Horizon Corporation sales, and not on Horizon Realty sales. The additional compensation from Horizon Realty sales would not have been large in comparison to Abrams' total compensation since the amount Abrams received each year as commission for Horizon Corporation Sales approached the $72,000 maximum. For example, in 1979 Abrams received, in addition to his salary of $51,000, $63,640 in commissions from the sale of Horizon Corporation property. Had Abrams been paid a commission on Horizon Realty Sales, he would have received only $8,360 more because of the $72,000 ceiling. After approximately one year Abrams sent a memorandum to the president Nelson stating that he felt he was entitled to commissions on Horizon Realty sales under his employment agreement. Specifically, he stated "There is no question in my mind that [these sales] are part of the agreement. Do you have a different recollection? I'd like to get this resolved." Nelson returned the note with the reply handwritten at the top that "While I do not believe we discussed this specifically at all, I agree that you *are* entitled to it." (Emphasis in original.) On 29 June 1977 Nelson sent a further memorandum to Abrams saying

> [I]n the discussions about your overall arrangement the figures we used to discuss the volumes that would produce the total bonus did not include such volumes. However, I think that was an oversight, and that your bonus should be based in part on such sales.

Abrams and Nelson negotiated over the next two years in an attempt to reach an agreement which would resolve the question of commissions for sales made by Horizon Realty. A new agreement was not, however, made.

Abrams continued in his position of vice president of sales until 31 January 1979, when Nelson issued a memorandum which elevated Abrams to executive vice president of Horizon Corporation, and formally relieved him of supervisory duties over the Texas and New Mexico sales operations. However, Nelson verbally instructed Abrams to continue supervising the Texas and New Mexico activities as before, and Abrams relied upon these instructions and upon the representation that he would continue to receive commissions on sales by Horizon Corporation in Texas and New Mexico, as well as on sales in Arizona.

In the fall of 1979 a shareholder's proxy fight resulted in a change of management at Horizon Corporation. In early 1980 a new board of directors was installed, and a new president, Donald White, was appointed. Abrams was initially asked by new management to remain in his current position under the terms of his existing at-will employment contract.

In February 1980, Abrams asked the comptroller of Horizon Corporation, Kenneth Badertscher, to compute the commissions Abrams had accrued for the first six months of the current fiscal year, 1 June 1979 to 30 November 1979. He was informed these commissions totaled $34,287.14. The method of computation included Arizona, Texas and New Mexico Horizon Corporation sales, but excluded Horizon Realty Sales.

On 3 March 1980, Abrams sent a memorandum to the new president White regarding compensation. He informed White of the Horizon Realty issue which arose in 1977, and specifically referred White to the 29 June 1977 letter from former president Nelson, suggesting this memo settled the issue "at least as to definition." He next referred to the 31 January 1979 "Management Organization" memorandum, but ap-

prised White that "I was told by Nelson at that time that I was to continue to play a role in the overall sales of the Company." He also informed the new president of the extensive but unsuccessful negotiations he had conducted with Nelson to arrive at a new contract which would have resolved the Horizon Realty commissions issue. He concluded, "I would appreciate discussing this further with you so the matter can be finalized."

On 19 March 1980 Abrams was discharged from employment. Eight days later he made a demand for back commissions totaling $153,735, consisting of Horizon Corporation commissions of $35,000, and Horizon Realty commissions of $118,735.[1] Horizon Corporation did not pay Abrams this amount, nor did it make a valid tender of any of the back commissions due. Horizon Corporation was aware, however, that it owed Abrams at least $34,287.14, and on 31 May 1980 an entry was made in the general ledger that $34,287.14 was owed to Abrams.

Abrams filed suit in Superior Court to recover commissions due on Horizon Corporation sales, commissions due on Horizon Realty sales, and treble damages for the wrongful withholding of wages. The court found that Abrams was owed $46,086 for commissions on Horizon Corporation sales, including the Texas and New Mexico sales. It further found that as to $34,287.14 of these commissions, no good faith dispute existed, and therefore Horizon Corporation was liable for treble damages on this amount under A.R.S. § 23–355. The commissioner denied the Horizon Realty commissions claim, finding in the alternative that (1) the contract "clearly and unambiguously * * * exclud[ed] 'Horizon Realty' sales," or (2) even if the contract is regarded as ambiguous, the course of performance

in which Horizon Realty commissions were not paid indicates both parties' interpretation that the contract did not include such commissions. An award of attorney's fees was made to Abrams in the amount of $21,000 for the successful Horizon Corporation commissions claim.

The Court of Appeals upheld the award of $46,086 for Horizon Corporation sales commissions, but reversed the award of treble damages under A.R.S. § 23–355. The court also upheld the trial commissioner's determination that Abrams was not entitled to commissions on Horizon Realty sales, and remanded the case for a redetermination of attorney's fees. We accepted Abrams' petition for review.

## THE HORIZON CORPORATION CLAIM

After discharging Abrams, Horizon Corporation took the position that Abrams was not entitled to commissions on Texas and New Mexico sales. Horizon therefore asserted that it owed Abrams no further Horizon Corporation commissions, and that in fact he had been overpaid. The trial court found that Abrams was entitled to compensation for the Texas and New Mexico sales, and therefore he was owed a total of $46,086 in back commissions for Horizon Corporation sales. Specifically, Abrams rendered supervisory services over Texas and New Mexico sales after the formal reorganization, and did so at the direct request of Horizon Corporation's president Nelson, who assured Abrams of continued compensation.

█ The trial court found that the employer "was aware" that it owed Abrams Horizon Corporation commissions of at least $34,287 at the time of discharge, and imposed treble damages on the employer pursuant to A.R.S. § 23–355.[2] This section

1. Later computations established that the actual amount of commissions on Horizon Corporation sales owed to Abrams up to the date of termination was $46,086. Horizon Realty commissions for the preceding four years would have totaled $166,254, but by application of the contractual maximum annual limitation on commissions, Horizon Realty commissions

would have provided only additional compensation of $40,278.

2. The treble damage award was based on the $34,287 in Horizon Corporation commissions for the first half of the fiscal year, rather than the full $46,086 owed to Abrams. The difference of $11,799 represents commissions for the last half of the fiscal year ending 31 May 1980. It appears that the exact amount of these later

provides treble damage liability on employers that wrongfully withhold wages. At the time this cause of action arose, the section read:

§ 23–355 Action by employee to recover wages; amount of recovery

If an employer, in violation of the provisions of this chapter, shall fail to pay wages due any employee, such employee may recover in a civil action against an employer or former employer an amount which is treble the amount of the unpaid wages, together with costs and reasonable attorneys fees to be allowed by the court on the basis of time and effort expended by counsel in behalf of the plaintiff employee.

A preliminary question is whether sales commissions are "wages" under the above statute. In *Apache East, Inc. v. Wiegand,* 119 Ariz. 308, 311, 580 P.2d 769, 772 (App.1978), our Court of Appeals held that sales commissions owed to a parts manager of a motorcycle dealership were "wages" for the purposes of A.R.S. § 23–355, and awarded treble damages. The court stated:

For the purposes of § 23–355, wages are defined as the nondiscretionary compensation due an employee in return for work for which the employee has a reasonable expectation to be paid. (Citations omitted.) Id.

The court reasoned that the commissions in that case were paid for the personal labor of supervising sales employees under the manager, and found this to fit within the definition of wages. We agree with the Court of Appeals' definition and reasoning, and similarly hold the sales commissions in the instant case are wages.

Although the Court of Appeals agreed that the commissions withheld in the instant case were wages, it nonetheless reversed the treble damage award based on a statutory "good faith wage dispute" defense. We note initially that the Court of

Appeals inadvertently applied the wrong version of the wage statute. In 1980, a new A.R.S. § 23–352 was added providing a specific statutory "reasonable good faith dispute" exception to A.R.S. § 23–355. It states:

§ 23–352 Withholding of wages

No employer may withhold or divert any portion of an employee's wages unless one of the following applies:

\* \* \* \* \* \*

3. There is a reasonable good faith dispute as to the amount of wages due, including the amount of any counterclaim or any claim of debt, reimbursement, recoupment or set-off asserted by the employer against the employee. Added by Laws 1980, Ch. 202, § 4.

The effective date of the amendment was 31 July 1980, four months after Abrams' employment was terminated, and two months after this lawsuit was filed. The effect of the Court of Appeals' opinion was to apply this statutory provision retroactively. A.R.S. § 1–244 provides "No statute is retroactive unless expressly declared therein." Arizona courts recognize a limited exception to this general rule. "Under the exception a statute does have retroactive effect if it is merely procedural and does not affect an earlier established substantive right." *Bouldin v. Turek,* 125 Ariz. 77, 78, 607 P.2d 954, 955 (1979); *accord Allen v. Fisher,* 118 Ariz. 95, 96, 574 P.2d 1314, 1315 (App.1977). In *Allen v. Fisher,* the Court of Appeals specifically held, "A rule affecting the measure of damages is a substantive right, (citation omitted) and a change in the law affecting the measure of an injured person's right of recovery cannot be applied retroactively." Id. at 97, 574 P.2d at 1316. The new statutory defense against treble damage liability clearly affects an "earlier established substantive right," and so it may not be given retroactive application. We therefore do not apply

commissions was not ascertainable until a time significantly after Abrams' discharge. Therefore, these later commissions were not "due" at the time of discharge, *see* A.R.S. §§ 23–353, 23–355, and thus it was correct for the trial

commissioner to conclude it would be improper to impose treble damages for failure to pay this portion of the claim at or near the time of termination.

or interpret this new statutory provision in the instant case.

This does not mean, however, that a "good faith wage dispute" defense cannot be raised in this case. In *Apache East, Inc. v. Wiegand,* supra, the Court of Appeals held "it was the intent of the legislature" in enacting § 23–355, "when it used the term 'may,' to leave discretion in the courts in determining when this penalty should be imposed." 119 Ariz. at 312, 580 P.2d at 773. To guide this discretion, the court adopted the standard that "[t]he treble damages penalty should not be awarded when there is a reasonable good faith wage dispute between the employer and the employee." Id. The court reasoned that "§ 23–355 was directed against employers who seek to delay payment of wages without reasonable justification or who seek to defraud employees of wages earned." Id. In that case the court found a reasonable good faith wage dispute did not exist, where the dispute "was in part created by the negligent manner in which the appellants handled the bookkeeping and wage records." Id. at 313, 580 P.2d at 774. This standard was also applied in *Cummings v. Aviation Specialties Trade Corp.,* 120 Ariz. 536, 537, 587 P.2d 255, 256 (App.1978). There the Court of Appeals found that a good faith dispute did arise from differing interpretations of a complex compensation formula.

■ In the instant case the trial court found that no good faith dispute existed as to Abrams' right to receive the $34,287.14 in Horizon Corporation commissions due, including the Texas and New Mexico sales. There is substantial support in the record for this finding. The knowledge and representations of the corporation's comptroller, the 3 March 1980 memorandum notifying the new management that Abrams was told to continue supervising overall sales of the

organization, and the entry on the corporate books of the wage liability, all support the conclusion that the withholding of these Horizon Corporation commissions was not in good faith. The imposition of treble damages under A.R.S. § 23–355 was therefore proper.[3]

## THE HORIZON REALTY CLAIM

■ The trial court held that the contract "unambiguously . . . exclud[ed] 'Horizon Realty' sales," but that even if the contract was regarded as ambiguous, the course of performance suggested a mutual interpretation of the contract excluding these sales. The issue of whether a contract is ambiguous is a question of law, which may be decided independently by a reviewing court. *See Associated Students of the Univ. of Arizona v. Arizona Board of Regents,* 120 Ariz. 100, 104, 584 P.2d 564, 568 (App.1978); *see also Giovanelli v. First Fed. Savings and Loan Ass'n,* 120 Ariz. 577, 583, 587 P.2d 763, 769 (App.1978).

■ The contract in question provided that Abrams' compensation would include, "Commissions of one-half percent (½%) on all home or land sales made by sales personnel under Abrams' supervision * * *." The contract further defined "Commissionable Sales Contracts" as "bona fide sales contracts written . . . on properties *of HORIZON * * *.*" (Emphasis added.) Horizon takes the position that the term "of HORIZON" refers to only Horizon Corporation, and excludes Horizon Realty. Abrams takes the position that the term "of HORIZON" encompasses both Horizon Corporation and Horizon Realty. We believe that, as a matter of law, the term is ambiguous. It is unclear from reading the employment contract whether the term "HORIZON" refers to the parent corporation only, or to

---

**3.** We reject the employer's assertion that its failure to pay Horizon Corporation commissions is excused by the existence of a good faith dispute over Horizon Realty commissions. The employer tries to characterize this as a case involving a single unliquidated wage dispute. In fact, this case involves two distinct wage claims, one of which was not disputed by the employer in good faith, exposing the employer to treble damage liability. We therefore find it unnecessary to address at this time a narrower issue posed by the parties, that is: where a good faith dispute exists as to part of an individual claim for wages due, must an employer tender the liquidated portion of the claim to avoid treble damages liability?

the parent and its similarly named subsidiaries.

■ Where the contract is ambiguous, it is appropriate to look to parol evidence to resolve the ambiguity. *Standard Ventures, Inc. v. State,* 114 Ariz. 480, 482, 562 P.2d 360, 362 (1977); *Joy Enterprises, Inc. v. Reppel,* 112 Ariz. 42, 46, 537 P.2d 591, 595 (1975). In doing so, we find persuasive the source document from which the ambiguous phrase "of HORIZON" was taken. This compensation provision was taken from the standard sales representative's agreement, where "HORIZON" is specifically defined to mean "HORIZON CORPORATION *and its subsidiaries*" (emphasis added). Evidence in the trial court indicates that contracts with similar wording were used to employ salesmen and sales supervisors throughout the organization, and that sales personnel received commissions on both Horizon Corporation and Horizon Realty Sales.

■ The trial court indicated that the course of performance by Horizon and Abrams suggested a mutual interpretation which excluded Horizon Realty commissions. It appears that this conclusion was based on Horizon's failure to pay such commissions for over three years, and Abrams' remaining on the job without firmly demanding these commissions or quitting. The Restatement (Second) of Contracts provides,

> Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in *without objection* is given great weight in the interpretation of the agreement. Restatement (Second) of Contracts § 202(4) (1979). (Emphasis added.)

We do not believe that Abrams can properly be characterized as having "acquiesced" in Horizon's failure to pay Horizon Realty commissions. The omission in calculating compensation was certainly not received "without objection." Abrams objected to this omission, and documented his objections. Upon learning in 1977 that commissions were not being paid on Horizon Realty sales, he sent a memorandum to then-president Nelson stating that he felt there was "no question" that Horizon Realty sales were included in his agreement and asking for a resolution of the problem. He then negotiated with Nelson for an extended period, attempting to resolve this issue. When Nelson was replaced by White in 1980, Abrams sent the 3 March 1980 memorandum to the new president informing him of the history of the dispute and asking that the matter be finalized. We believe this provided sufficient objection to the course of performance to make this doctrine inapplicable against Abrams.

In addition to the parol evidence, the interpretation which includes Horizon Realty commissions is supported by the preference to construe ambiguities against the drafter. *See* Restatement (Second) of Contracts § 206, and Official Comment a (1979). The instant contract was drafted by Horizon through its legal staff. The phrase from which the ambiguity arose was taken from Horizon's standard sales representative's contract, which was also drafted by its legal staff.

We therefore find that the parol evidence in this case and the preference against the drafter support an interpretation of the contract which includes compensation for Horizon Realty sales. Unlike the claim for Horizon Corporation commissions, it is clear that a good faith dispute existed as to the claim for Horizon Realty commissions, and we are not concerned with the question of treble damages or attorney's fees as to non-payment of Horizon Realty commissions. *See also Cummings v. Aviation Trade Corp.,* supra, 120 Ariz. at 537, 587 P.2d at 2561.

## ATTORNEY'S FEES AND COSTS

■ The trial commissioner awarded Abrams $21,000 in attorney's fees for his successful wage claim. At the time this cause of action arose, A.R.S. § 23–355 provided for both treble damages and attorney's fees for successful wage claimants. The 1980 amendments to Title 23 removed

**80**

the attorney's fees provision from A.R.S. § 23–355. *See* Laws 1980, Ch. 202, § 6. The Court of Appeals vacated the attorney's fees awarded in the 1981 judgment. The court implied that the award was improper under the 1980 amendment to A.R.S. § 23–355, but suggested that an award may be appropriate under A.R.S. § 12–341.01, which allows a judge discretion to set an award for attorney's fees to the prevailing party in contract actions. *See* A.R.S. § 12–341.01(A), (B). The Court of Appeals remanded the question of attorney's fees for reconsideration of the proper amount to be awarded under A.R.S. § 12–341.01, in light of the reduced judgment.

The effective date of the amendment to A.R.S. § 23–355 was 31 July 1980, which again is four months after the termination of employment from which this cause of action arose. We note that the application of this amendment by the Court of Appeals was also retroactive. Under the rule of *Bouldin v. Turek,* supra, it would be appropriate to apply the repeal of this attorney's fees provision retroactively only if it was regarded as procedural in nature, and not affecting earlier established substantive rights. *Bouldin v. Turek* itself involved the question of whether attorney's fees provisions are substantive or procedural, and decided that they are substantive in nature. The issue in that case was whether the newly enacted A.R.S. § 12–341.01, discussed above, applied to suits commenced before the statute's effective date, but decided after the effective date. The court in *Bouldin v. Turek,* supra, held,

> We * * * find, as a general rule, that a statute providing for an award of attorney's fees is similar in effect to one changing the measure of damages, as in [*Allen v. Fisher,* supra]. We agree * * * that such a provision is substantive and not procedural. 125 Ariz. at 78, 607 P.2d at 955.

The rule is the same whether we are dealing with the enactment or repeal of attorney's fees provisions. The award of attorney's fees was proper under both A.R.S. § 12–341.01 and A.R.S. § 23–355.

The opinion of the Court of Appeals is vacated, and the matter is remanded to the trial court with instructions to award additional compensation for Horizon Realty sales in the amount of $40,278. In all other respects, the judgment of the trial court is affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS, J., concur.

FELDMAN, J., did not participate in the determination of this matter.