916 P.2d 492

STATE of Arizona, ex rel. Edward Z. FOX, Director, Arizona Department of Environmental Quality, and Grant Woods, Arizona Attorney General, Plaintiffs–Appellees, Cross Appellants,

v.

The NEW PHOENIX AUTO AUCTION, LTD., an Arizona corporation, Defendant–Appellant, Cross Appellee.

Nos. 1 CA–CV 94–0253, 1 CA–CV 94–0323.

Court of Appeals of Arizona, Division 1, Department D.

April 9, 1996.

A dealer may discharge this duty by having each vehicle inspected at an official state inspection station, A.R.S. § 49–542(B), in which event it receives a certificate of compliance to pass on to the customer. Ariz.Admin.Code ("A.A.C.") R18–2–1007(A), 1011. The dealer may, however, elect to perform its own inspections, in which case it must obtain a "fleet inspection" permit from the Arizona Department of Environmental Quality ("DEQ"). A.R.S. § 49–546. Upon issuing such a permit, DEQ also issues individual certificates of inspection which are to be validated by the fleet inspector for each vehicle at the time it is inspected and passes. A.R.S. § 49–543(E). The fleet inspector must also record the results in a "fleet vehicle inspection report/monthly summary." A.A.C. R18–2–1019(I). With the validated certificate of inspection, the customer may then register the vehicle. A.A.C. R18–2–1007(A)(1), (B).

Grant Woods, Attorney General by Matthew P. Millea, Assistant Attorney General, Phoenix, for Plaintiffs–Appellees, Cross Appellants.

Mohr, Hackett, Pederson, Blakley, Randolph & Haga, P.C. by Arthur W. Pederson, Nathaniel B. Rose, Daniel W. McCarthy, Phoenix, for Defendant–Appellant, Cross Appellee.

## OPINION

SULT, Judge.

### BACKGROUND

Arizona Revised Statutes Annotated ("A.R.S.") Title 49, Chapter 3, Article 5 sets forth requirements for emissions-related inspections of motor vehicles. Generally speaking, in a vehicle emissions control area such as Maricopa County, a licensed[1] dealer may not deliver a vehicle to a retail customer until it passes an emissions and tampering inspection. A.R.S. § 49–542(D). The customer cannot register a vehicle until it has been inspected and the dealer is required to bear the cost of inspection. *Id.*

### FACTS AND PROCEDURAL HISTORY

Appellant New Phoenix Auto Auction, Ltd. ("New Phoenix") is a licensed used car dealer in Maricopa County. In addition, it held a fleet inspection permit until November 18, 1992, under which it performed and certified its own emissions and tampering inspections on vehicles it sold. On August 16, 1993, DEQ filed a civil complaint in Maricopa County Superior Court alleging that between September 8 and December 18, 1992, New Phoenix delivered to retail customers eight vehicles that had not passed emissions and tampering inspections. DEQ alleged that each delivery was a violation of section 49–542(D). DEQ moved for partial summary judgment on seven of the eight counts, arguing that New Phoenix could produce no official documentation showing that it successfully inspected the seven vehicles before delivery to retail customers. DEQ sought $13,000 in penalties and a 540–day suspension of New Phoenix's motor vehicle dealer's license for the seven alleged violations, arguing that these sanctions were mandated by section 49–550(F).

---

**1.** Automobile dealers are licensed pursuant to A.R.S., Title 28, Chapter 8.

New Phoenix admitted that it had no official documentation of the inspections by its fleet inspector and did not claim that the vehicles had been inspected at official state stations. However, New Phoenix offered evidence that it alleged created a material issue of fact concerning whether its fleet inspector had nevertheless inspected and passed the vehicles before delivery. The trial court granted DEQ's motion for partial summary judgment on all seven counts but held that section 49–550(F) authorized penalties of only $3,000 and a 90–day license suspension. New Phoenix appealed the finding of liability and DEQ cross-appealed the imposition of a reduced penalty. We have jurisdiction pursuant to A.R.S. section 12–2101(B), (F).

## DISCUSSION

### 1. The Appeal of New Phoenix

DEQ argues two bases in support of the judgment. It first argues that New Phoenix's admitted failure to validate the inspections as required by subsection 543(E) is *per se* a violation of the "shall not deliver" prohibition of subsection 542(D), regardless whether the vehicles had actually passed an inspection. DEQ alternatively argues that if subsections 542(D) and 543(E) are not so construed, New Phoenix's admitted violation of subsection 543(E) compels, in the summary judgment context, a finding of subsection 542(D) violations. We disagree with DEQ on both counts.

■ In construing legislation, this court first looks to the plain meaning of a statute and applies that meaning unless impossible or absurd consequences will result.[2] *In re Marriage of Gray*, 144 Ariz. 89, 91, 695 P.2d 1127, 1129 (1985). Subsection 542(D) provides:

A vehicle shall not be registered or reregistered until such vehicle has passed the emissions inspection and the tampering inspection prescribed in subsection G of this section or has been issued a certificate of waiver. If any vehicle to be registered

or reregistered is being sold by a dealer licensed to sell motor vehicles pursuant to title 28, the cost of any inspection and any repairs necessary to pass the inspection shall be borne by the dealer. A dealer who is licensed to sell motor vehicles pursuant to title 28 and whose place of business is located in a vehicle emissions control area shall not deliver any vehicle to the retail purchaser until the vehicle passes any *inspection* required by this article or the vehicle is exempt under subsection H [now J] of this section.

(Footnote omitted, emphasis added.)

Subsection 543(E) provides:

The department [DEQ] shall issue certificates of inspection to owners of fleet emissions inspection stations. Each certificate shall be validated by the fleet emissions inspection stations in a manner required by the director at the time that each owner's fleet vehicle has been inspected or has passed inspection. The validated certificate of inspection shall indicate at the time of registration that the owner's fleet vehicle has been inspected and that the vehicle has passed inspection.

■ Neither statute admits of the construction DEQ's first argument would require. Subsection 542(D) does not expressly require that the inspection be certified or otherwise documented. Rather, it plainly speaks only to inspections and subsection 543(E) plainly speaks only to validating certifications. These statutes contemplate two separate actions and while certification is obviously intended to follow closely on the heels of inspection, there is nothing about the performance of these actions that requires us to find that one could not be performed without the other necessarily also being performed. We do not think that any reasonable person reading the two statutes together would conclude that the absence of an inspection certificate categorically shows that the underlying inspection could not have been performed. To adopt DEQ's construc-

---

**2.** On appeal, both parties cite to and argue from the 1994 version of the relevant statutes, notwithstanding the alleged offenses occurred during 1992 when different versions were in effect. Our examination of the respective versions, however, discloses that there are only minor differences which do not in any way affect the parties' arguments or our analysis. The statutes we set out *in haec verba* are the versions that were in effect during the relevant time period in 1992.

tion to this effect would require us to find that "inspection" in subsection 542(D) really means "inspection and certification." This is not the plain meaning of the statute.

We find support in related statutes for rejecting DEQ's proposed reading of subsections 542(D) and 543(E). For example, subsection 541(1) defines certificate as a serially numbered device or symbol "indicating that a vehicle has been inspected ... and *has passed inspection.*" (Emphasis added.) Subsection 546(B) provides that a certificate shall not "be issued to any fleet vehicle *until it has been inspected and found to comply with applicable regulations.*" (Emphasis added.) These subsections, speaking as they do in the past tense, clearly contemplate a physical process of the certification happening subsequent to the inspection. This certainly militates against an interpretation that would inextricably combine the two as a matter of law.

Nevertheless, DEQ advances as justification for such a reading that the legislature, in enacting subsection 542(D), intended to protect consumers by placing the burden on dealers to insure that vehicles are ready to be registered before delivery to retail customers. Thus, DEQ reasons, this purpose of subsection 542(D) would be frustrated by permitting dealers to deliver fleet vehicles without issued certificates of inspection since the purchaser would then be unable to register the vehicle.

Our take on the purpose of this statute is different from that of DEQ. We note that subsection 542(D) appears in Title 49 of the Arizona Revised Statutes entitled "THE ENVIRONMENT." It is part of Chapter 3 of Title 49 entitled "AIR QUALITY." Finally, it is part of Article 5 of Chapter 3 entitled "ANNUAL EMISSIONS INSPECTION OF MOTOR VEHICLES." Clearly, the primary purpose of subsection 542(D) is environmental protection. Any "consumer protection" effect is incidental and definitely insufficient to support DEQ's strained reading of these statutes.

We also question the need to read a consumer protection rationale into these statutes. We note that a dealer who performs fleet inspections is unlikely to be motivated to deliver a vehicle to a retail customer without the required inspection. Section 49–546(F) permits the revocation or suspension of a fleet inspection permit for such a violation and section 49–550(A) provides criminal penalties including up to four months in jail and a $750 fine. We think these sanctions should prove to be sufficient motivation for dealers to comply with the provisions of Article 5 without our rewriting subsections 542(D) and 543(E) in the manner DEQ requests.

■ We next consider DEQ's second argument in support of the trial court's grant of partial summary judgment. DEQ urges that the admission of New Phoenix's failure to certify the fleet inspections was the only relevant evidence presented on the issue whether inspections were performed. It argues that the evidence offered by New Phoenix, consisting of affidavits, internal records and monthly inspection summaries, is legally irrelevant since these documents do not constitute official records. The only evidence that could create an issue of fact would be the official records, namely the validated certificates of inspection for the seven subject vehicles, and these admittedly do not exist.

DEQ cites no authority for this proposition. We agree with DEQ that the presence or absence of an inspection certificate is certainly compelling evidence that the underlying inspection was or was not performed. However, we are aware of no rule of law or evidence which would limit a trial court's consideration on this issue to "official" records. To create such a rule would have the effect of reading into the statutes a conclusive presumption that lack of a validated inspection certificate requires the finding that an inspection was not performed. We have already declined to do so as a matter of statutory construction and we see no reason to accomplish the same result by creating a rule of evidence which has no legal or logical underpinning.

■ We will therefore proceed to evaluate the New Phoenix evidence to determine, as in any other such review, the propriety of the grant of partial summary judgment. Summary judgment is proper only where the

evidence presented by the nonmoving party is of so little probative value that a reasonable trier of fact could not find in favor of that party. *Orme School v. Reeves,* 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). In reviewing a grant of summary judgment, we will view the facts and resolve all reasonable inferences in a light most favorable to the party against whom judgment was granted. *Webster v. Culbertson,* 158 Ariz. 159, 162, 761 P.2d 1063, 1066 (1988); *Bishop v. State Dep't of Corrections,* 172 Ariz. 472, 475, 837 P.2d 1207, 1210 (App.1992).

■ New Phoenix presented affidavits, internal records and monthly fleet inspection summaries showing that: (1) New Phoenix employed Robert Francis to perform fleet inspections on all vehicles before delivery to customers and Francis performed and certified over 500 fleet inspections from July through October 1992;[3] (2) the vehicles in question were sold during a period when New Phoenix was moving to a new business location; (3) New Phoenix checked the vehicles to insure that all emission equipment was intact and operable before delivery; (4) after delivery, four of the vehicles passed a subsequent state inspection arranged by New Phoenix and the other three vehicles, although initially failing, were retested successfully within an hour and a half, having needed no repair; and (5) New Phoenix gains no advantage from delivering vehicles without inspecting them.

New Phoenix argues that these facts and the reasonable inferences to be drawn from them demonstrate: (1) that Francis had a pattern and practice to perform inspections and certifications; (2) the disruption arising from the relocation of the business accounts for the absence of the certificates showing the inspections were completed; (3) there is no reason that New Phoenix would insure the emissions equipment on the vehicles was operable and then not complete the inspections; (4) on a post-delivery state inspection, four vehicles passing immediately and three vehicles passing soon after a testing failure with no need of repair permits an inference that all seven probably were inspected and passed

pre-delivery; and (5) New Phoenix had absolutely no motive not to inspect all vehicles.

■ We consider, as DEQ points out, that New Phoenix has offered only circumstantial evidence bearing on whether it performed the required inspections before delivery. However, a court should not diminish the probative value of evidence only because it is circumstantial. *Farm–Aero Service, Inc. v. Henning Produce, Inc.,* 23 Ariz.App. 239, 240, 532 P.2d 181, 182 (1975). After evaluating the evidence offered by New Phoenix, as well as the evidence offered by DEQ, we conclude that a reasonable trier of fact could find that New Phoenix properly inspected all seven vehicles before delivery. Therefore, we hold that the trial court improperly granted DEQ's motion for partial summary judgment.

## 2. The Cross–Appeal of DEQ

■ Since on remand New Phoenix may be found to have violated subsection 542(D), we address whether the trial court may penalize New Phoenix under subsection 550(F). To aid in this discussion, we set forth section 49–550 in its entirety:

A. Except as provided in subsection B of this section, any person who violates any provision of this article or any rule or regulation of the director adopted under this article is guilty of a class 2 misdemeanor.

B. Any person who makes or issues any imitation or counterfeit of an official certificate or certificates of inspection or waiver is guilty of a class 5 felony.

C. Any person who knowingly demands or collects a fee for the inspection of a vehicle other than the fee fixed by the director for the inspection of vehicles of the same class is guilty of a class 2 misdemeanor.

D. Any person who makes or provides to the director the written statement required to obtain a certificate of waiver pursuant to 49–542, subsection J [now L], knowing the statement to be false, is guilty of a class 2 misdemeanor.

**3.** Francis died in August of 1993, the same month DEQ filed its complaint against New

Phoenix, and apparently no deposition of Francis was taken before his death.

E.   In addition to any other criminal penalty provided by law, a person who owns a vehicle and whose residence is located outside of a vehicle emissions control area but who commutes in that vehicle to the driver's principle place of employment located within a nonattainment area without complying with this article is subject to a civil penalty of fifty dollars for a first violation of this subsection.   For a second violation of this subsection within a one year period, a court shall impose a civil penalty of three hundred dollars.   A court shall impose a civil penalty of twenty-five dollars for a first time violation of this subsection if the owner presents evidence that the vehicle is in compliance with this article.

F.   In addition to any other criminal penalty provided by law, *any dealer* who is licensed to sell motor vehicles pursuant to title 28, chapter 8, whose place of business is located in a nonattainment area and *who delivers a vehicle that does not conform with this section* is subject to a civil penalty of one thousand dollars for the first violation of this subsection.   For a second violation of this subsection within a one year period, a court shall impose a civil penalty of two thousand dollars and a suspension of their license for a period of ninety days.

(Emphasis added.)

The trial court accepted DEQ's argument that, notwithstanding that subsection 550(F) on its face is limited in its application to a violation of "this section," meaning section 49–550, the violation of a different section, namely section 49–542(D), nevertheless subjected New Phoenix to the penalty provisions of subsection 550(F).   As we understand DEQ's reasoning in support of this ruling, it argues that subsection (A) of section 49–550 in effect acts as an "incorporating" agent, bringing within the ambit of section 49–550 the entirety of Article 5, including section 49–542.   Therefore, DEQ argues, notwithstanding that subsection 550(F) uses the word "section," the legislature intended via subsection 550(A) and its use of "article" to permit imposition of civil penalties on dealers who commit any violation of Article 5.   DEQ further argues that since the legislature has the

power to impose both criminal and civil penalties on the same conduct, citing *Arizona State Bd. of Dental Examiners v. Hyder,* 114 Ariz. 544, 547, 562 P.2d 717, 720 (1977), the obvious intent of the legislature was to permit the agency to cite a car dealer for a violation of section 49–542 under either the criminal provision of section 49–550(A), the civil provision of section 49–550(F), or both.

New Phoenix responds that DEQ's construction renders other statutes meaningless.   For example, it notes that section 49–546(F) provides for a revocation or suspension of a fleet inspection permit if a dealer violates subsection 543(E) by failing to validate a certificate.   By applying a general penalty provision, subsection 550(F), the trial court ignored the more specific remedy tailored to the violation.

New Phoenix next argues that DEQ's construction amounts to a death penalty for a car dealer that commits any minor infraction.   If subsection 550(F) is construed to apply to any violation of Article 5, then two unintentional and minor infractions of the Article's many provisions could result in a 90 day suspension of the dealer's license to do business, with each subsequent infraction adding another 90 days.   This is not a result the legislature could have intended.

·  New Phoenix lastly argues that DEQ's construction leads to a statute which fails to give appropriate notice of prohibited conduct.   New Phoenix points out that subsection 550(F) itself does not identify specific conduct that will lead to its application nor does it refer to any other provision that would give such notice.   Moreover, the subsection lacks any standards that would restrict the discretion of those who would apply it.   Therefore, New Phoenix concludes, the statute is unconstitutionally vague and cannot be saved by the trial court's interpretation since the statute is simply not susceptible to that reading.

While we disagree that the statute is not susceptible to a saving construction, we do agree that DEQ's approach is not the answer.   The fundamental difficulty with DEQ's argument is that it would result in a *de facto* change of the word "section" in subsection 550(F) to "article."   This we can-

not do. Here we are dealing with the legislature's own vocabulary. The words "title," "chapter," "article" and "section" are used throughout the codification of Arizona statutory law and each has a consistent usage and meaning. If there is ever a situation where we are compelled to follow the maxim that "[t]he plain meaning of a statute must be observed," *Local 266 v. Salt River Project,* 78 Ariz. 30, 38, 275 P.2d 393, 399 (1954), it is when the legislature expresses itself using its own technical terms. *See* A.R.S. § 1–213 ("Technical words and phrases and those which have acquired a peculiar and appropriate meaning in the law shall be construed according to such peculiar and appropriate meaning.")

DEQ's assertion that subsection 550(A) acts as some kind of incorporating agent simply is not reasonable. That subsection is a punishment statute, just like subsection 550(F), and it does not identify specific prohibited conduct, the commission of which would invoke the sanctions of subsection 550(F). Rather, it identifies the whole of Article 5 for the obvious purpose of permitting the imposition of Class 2 misdemeanor criminal sanctions on any conduct in violation of the article. This conduct could be that of a dealer or individual vehicle owner and could involve a dealer's delivery of a nonconforming vehicle (542(D)), a vehicle owner's failure to affix a compliance sticker to a vehicle (542(E)), an inspection station's failure to have a mechanic available (542(B)), or other similar acts or omissions, both major and minor.

By contrast, subsection 550(F) references only section 550 for the purpose of permitting the imposition of civil penalties on the specific conduct which violates **that** section. If the legislature had intended these civil penalties to apply to all dealer conduct which may be in violation of other sections of Article 5, it would have said so by using "article" instead of "section." That it did not do so leads us to conclude that the civil penalties of subsection 550(F) are not applicable to other dealer violations of Article 5, including section 49–542(D). *See* A.R.S. § 1–211(C); *Abrams v. Horizon Corp.,* 137 Ariz. 112, 115, 669 P.2d 90, 93 (App.1982), *vacated on other grounds,* 137 Ariz. 73, 669 P.2d 51 (1983) (A court should construe statutes which impose civil penalties according to the fair import of their terms.)

This interpretation does not leave subsection 550(F) meaningless, as DEQ concludes. We note that for the most part violations of Article 5 are of a strict liability type, requiring no particular *mens rea.* Subsections (B), (C) and (D) of section 49–550, however, describe prohibited conduct of a wilful type and accordingly criminalize this conduct separately. While each of these subsections speaks of "a person," there is no reason why such a person could not be a dealer who delivers a vehicle that does not conform with section 49–550. For example, a dealer could deliver a vehicle that doesn't conform with section 49–550 by "mak[ing] or issu[ing] any imitation or counterfeit ... official certificate ... of inspection" for that vehicle, a violation of subsection (B). Or he could create a section 49–550 nonconforming vehicle if he "knowingly demands or collects a fee for the inspection of [that] vehicle other than the fee fixed by the director," a violation of subsection (C). Or he could knowingly make a false written statement about a vehicle he delivers "that an emissions control device which is necessary to repair the tampering is not available" (subsection 542(J)), a violation of subsection (D). These are wilful and fraudulent violations which, if committed by a person other than a dealer, are punishable only under the provisions of the respective subsections. We think it is reasonable given the nature of these violations, to conclude that the legislature intended to aggravate the punishment for licensed dealers who commit such violations by adding the severe civil sanctions of subsection 550(F). This reading not only gives meaning to the legislature's use of "section" in this subsection but also gives the subsection a construction that avoids the possibility of it being found unconstitutionally vague.

## CONCLUSION

We reverse the trial court's grant of summary judgment in favor of DEQ. We re-

mand this matter to the trial court for further proceedings consistent with this opinion.

GARBARINO, P.J., and LANKFORD, J., concur.