624 P.2d 887

**H. Barry ROSE, a married man, but dealing with his sole and separate property, Plaintiff/Appellant,**

v.

**Darryl B. DOBRAS, a married man, but dealing with his sole and separate property; Reesor and Nancy Woodling, husband and wife, Defendants/Appellees.**

No. 2 CA–CIV 3655.

Court of Appeals of Arizona, Division 2.

Jan. 2, 1981.

Rehearing Denied Jan. 28, 1981.

Review Denied March 3, 1981.

**210**

Slutes, Browning, Zlaket & Sakrison, P. C. by D. Tom Slutes and Ronald E. Curry, Tucson, for plaintiff/appellant.

Stompoly & Even, P. C. by John Patrick Lyons, Tucson, for defendants/appellees.

## OPINION

HATHAWAY, Chief Judge.

Appellant (seller) brought suit against appellees (buyers) alleging failure to pay the fee for an orchard management agreement entered into between the parties. Buyers counterclaimed and filed a third-party complaint which was settled. At trial to the court without a jury, the counter-claim was limited to securities fraud and breach of the management agreement. Buyers' proposed findings and conclusions were adopted with some changes and judgment was granted buyers on their counterclaim and on seller's complaint.

The following issues are presented on this appeal:

1. Is the sale of a lease to over 14 acres of land with an option to lease more, entered concurrently with a sale of trees and a management agreement under which the seller/manager may be fired on 30-days' notice and under which the buyer has substantial oversight authority an "investment contract" or a "security?"

2. Does sufficient evidence support the findings of trial court that seller intentionally misstated or omitted material facts in connection with these transactions?

3. Did seller mismanage the orchard or breach the management agreement in any way?

4. Did the trial court err in granting rescission of the agreements under the the-

ories of securities fraud and breach of contract and in failing to allow seller offsets in returning the parties to their prior positions?

5. Did the trial court err in failing to allow seller to allocate the money received as he saw fit when no allocation was made by buyers at time of payment and when insufficient consideration was provided by buyers to keep all agreements out of default?

6. Must the award of attorneys' fees to buyers be reversed with the reversal of the judgment on the issue of securities fraud?

On December 1, 1975, seller and Dobras entered into three agreements: A lease of over 14 acres of state-owned land in Cochise County, a "preliminary sales agreement" for apple trees and a "management agreement" covering the land and trees. On the same date, seller entered into three identical agreements with the Woodlings.

In 1970, seller acquired an assignment of a lease of a section of land in Cochise County near Pearce. He had earlier acquired title to 160 acres of land adjacent to the lease parcel. He planted apple trees and experimented with them. By 1975, the entire 160 acres of deeded land was planted and approximately one-half of the section of lease land was planted. The 160 acre parcel was used as the experimental part of the orchard. In 1975, seeking outside funds, the seller approached an investment brokerage firm with a proposition for individuals to invest or purchase interests in the apple orchard. He supplied information concerning the orchard. Eventually, buyers in this case were contacted. In various conversations with buyers, seller made certain representations concerning his ownership of an interest in the orchards, the use of sprinkler systems and their ability to protect the orchards, the availability of labor, the pH factor in the orchard soil, and the growth potential of the orchard's trees. Buyers, after examining the orchard and hiring an accountant and a lawyer to assist them, decided to proceed with the deal, and signed the various agreements. There was evidence that appellee Dobras traveled to Washington to make an independent investigation of the concept of apple orchards. However, he stayed in Washington only one day. Eventually, after the orchard failed to produce as per the expectations of the parties, seller sold all of his interest to a third party.

We first turn to the issue of whether the sale of the lease, coupled with the management agreement which the parties signed contemporaneously with the sales agreements, constitute an "investment contract" or a "security." The statutory definition of a security is found at A.R.S. Sec. 44–1801(13). It is substantially similar to the definitions found in the Securities Act of 1933 and the Securities Exchange Act of 1934. Federal interpretations are often looked to for guidance. *Greenfield v. Cheek*, 122 Ariz. 70, 593 P.2d 293 (App. 1978), approved, 122 Ariz. 57, 593 P.2d 280 (1979). An "investment contract" is included within the definition of a security in Sec. 44–1801(13). In *S.E.C. v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the supreme court set out the definition of an investment contract as any situation where (1) individuals are led to invest money (2) in a common enterprise (3) with the expectation that they will earn a profit solely through the efforts of others. In this case, there has clearly been an investment of money. Secondly, buyers' money has been invested in a common enterprise. Here, seller is involved in a common venture with each buyer, and there is more than one buyer. Vertical as well as horizontal commonality therefore exists. See *Brodt v. Bache & Co.*, 595 F.2d 459 (9th Cir. 1978).

The key to whether an investment contract exists in this case is whether buyers entered into the agreements with the expectation that profits would come solely from the efforts of the seller. The trial court found this to be the case and made a specific finding that the transactions herein constitute an investment contract under our security laws. Seller, on appeal, contends that even though he had the right to manage and operate the orchard under the

agreement, the fact that buyers had the power to cancel the agreement and actively inspect and control his operation of the orchard removes this transaction from the realm of a passive investment. In response, buyers argue that they were investing in only a part of the orchard, and that effective management by the seller of the overall orchard operation was necessary for them to make a profit.

■ In reviewing the evidence, we must keep in mind that the securities laws were designed to protect the public from speculative or fraudulent schemes of promoters. The supreme court has consistently construed the definition of "security" liberally. In searching for the meaning and scope of this term, form should be disregarded for substance and the emphasis should be on economic reality. *Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). In *S.E.C. v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir. 1973), cert. den. 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973), the court interpreted the third prong of the *Howey* test in a flexible and remedial fashion. Noting that strict interpretation of the requirement that profits be earned solely from the efforts of others has been subject to criticism, the court adopted a more realistic test:

> "[W]hether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Id.* at 482.

After reviewing the evidence in light of this standard, we conclude that although buyers here had some powers of control over their portion of the orchard, the undeniably significant management efforts were those of the seller, and therefore the agreements herein constitute an "investment contract" under our securities laws.

Buyers clearly did not buy their leasehold interest in a portion of the orchard in order to take advantage of increases in its land value. *Happy Investment Group v. Lakeworld Properties, Inc.*, 396 F.Supp. 175 (N.D.Cal.1975). Nor was their motivation for buying for purposes of "consumption,"

that is to occupy the land or develop it by their own efforts. *Timmreck v. Munn*, 433 F.Supp. 396 (N.D.Ill.1977). We consider the transactions to be similar to those in *Blackwell v. Bentsen*, 203 F.2d 690 (5th Cir. 1953), cert. dismissed 347 U.S. 925, 74 S.Ct. 528, 98 L.Ed. 1078 (1954), and *S.E.C. v. Bailey*, 41 F.Supp. 647 (S.D.Fla.1941). In *Blackwell*, a number of buyers purchased 20-acre units within a large citrus grove, entering into management agreements with the seller at the same time. While the seller's management company undertook full responsibility for harvesting and marketing the crops, the management contract contained provisions for a buyer to give directions as to the marketing of his crops. Further, the management contracts usually covered a period of one year, with an option to renew annually for up to five years. The Fifth Circuit, recognizing that few, if any, of the small tracts were purchased by citrus farmers who wished to cultivate them as a personal farming enterprise, held that despite having some degree of control over the management of their lots on the orchard, the buyers were in reality expecting profits solely through the efforts of the manager-seller. Therefore, the transactions amounted to an investment contract.

Seller contends the reasoning of the Eighth Circuit in *Fargo Partners v. Dain Corp.*, 540 F.2d 912 (8th Cir. 1976), and *Schultz v. Dain Corp.*, 568 F.2d 612 (8th Cir. 1978), must control here. In those cases, transactions in which the buyers purchased apartment developments, then immediately signed management agreements placing the seller or its agent in charge of managing the apartments, were held not to constitute investment contracts. In *Fargo Partners*, the court relied on the fact that the management agreement could be cancelled by the buyer upon 30-days' notice in reasoning that it therefore retained ultimate control of the operation of the apartment complex, removing the scheme from the definition of an investment contract. In *Schultz*, the same result was reached even though the management contract did not have a 30-day cancellation provision. The court there rea-

soned that Schultz was free to enter into the management contract and to negotiate its terms, and thus retained ultimate control over the apartment complex. In both cases, the Eighth Circuit stated that the facts showed the buyers were not small investors helplessly reliant on the seller's efforts because of lack of business knowledge or finances.

The management agreement herein contains a 30-day cancellation provision. However, it also provides that the manager may pool or commingle each buyer's fruit with fruit from other parts of the orchard in order to streamline the orchard's marketing procedures. This was not a case of seller managing only the particular parcel which buyers purchased, as in the Eighth Circuit cases, but rather a scheme in which buyers were dependent on the seller's skill in managing the overall orchard operation. A report prepared by seller and shown to buyers before the agreements were signed contains a glowing picture of the opportunities the apple orchard would enjoy over the future years. One paragraph is entitled, "Where Will the Invested Money Go?" Brief resumes are included of the key personnel to be employed in the orchard. A marketing system is outlined, including plans for a juicing facility which would "utilize virtually every usable apple in the orchard." The entire project was marketed with the concept of an experienced marketing team that would manage the orchard.

Most importantly, the Eighth Circuit cases may be distinguished by the fact that both buyers herein were relying solely on the managerial skill of seller in making their investment. This is a key factor in the determination of whether a transaction constitutes an investment contract. The United States District Court for the District of Arizona has stated "[w]hen the investor is relatively uninformed and then turns over hs [sic] money to others, essentially depending upon their representations and their honesty and skill in managing it, the transaction is generally considered to be an investment contract." *S.E.C. v. Heritage Trust Co.*, 402 F.Supp. 744 (D.Ariz.1975). Buyers herein, although possibly having the power to do so, could not practically step in and run their small portion of the orchard for profit. Even if they could have secured adequate alternative management, the success of their leasehold interest was inextricably dependent upon the managerial efforts of seller in managing the entire orchard. We therefore agree with the finding below that the lease agreement, the preliminary sales agreement and the management contract constitute "an investment contract" within the meaning of the Arizona security laws.

We next turn to the question of whether rescission was properly granted under our securities laws. A.R.S. Sec. 44–2001 provides:

"Voidable sale or contract for sale of securities; remedy

A sale or contract for sale of any securities to any purchaser in violation of any provision of Secs. 44–1841, 44–1842 or article 13 of this chapter, is voidable at the election of the purchaser, who may bring an action in a court of competent jurisdiction to recover the consideration paid for the securities, with interest thereon, taxable court costs and reasonable attorneys' fees, less the amount of any income received by dividend or otherwise from ownership of the securities, upon tender of the securities purchased or the contract made, or for damages if he no longer owns the securities."[1]

A.R.S. Sec. 44–1991, part of Article 13 of the securities law chapter, provides:

"Fraud in purchase or sale of securities
It is a fraudulent practice and unlawful for a person, in connection with a transaction or transactions within or from this state involving an offer to sell or buy securities, or a sale or purchase of securities, including securities exempted under Sec. 44–1843 or 44–1843.01 and including

1. Buyers never alleged a violation of A.R.S. Sec. 44-1841, which prohibits the sale of unregistered securities.

transactions exempted under Sec. 44–1844, directly or indirectly to do any of the following:

    1. Employ any device, scheme or artifice to defraud.

    2. Make any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

    3. Engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit."

    ▆▆▆ Seller contends that there was insufficient evidence to support the trial court's findings that he misstated or omitted any material facts in connection with the agreements under consideration. We disagree. First, it was not necessary for seller to have intentionally misstated material facts or to have intentionally omitted any material facts in order for A.R.S. Sec. 44–1991(2) to apply. Scienter is not an element of a violation of this section, even though it may be an element of A.R.S. Sec. 44–1991(1). *State v. Gunnison*, 127 Ariz. 110, 618 P.2d 604 (1980). The standard of materiality of omitted facts under the securities laws contemplates a "showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable (buyer)." *T.S.C. Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 767 (1976). Reviewing the facts under this standard we hold there is more than sufficient evidence in the record to support the trial court's finding that the seller made material misstatements of fact and material omissions of fact in regard to the orchard transactions. There was substantial evidence that seller implied he would retain an active interest in the orchard, when in fact he sold his entire interest to a third party when the venture proved to be unsuccessful. One of the keys to a successful growing season was the installation of a sprinkler system. There was evidence that despite seller's representations to the contrary, the system was not installed in time to save the April 1976 crop from frost. There was evidence of insufficient well water to supply the sprinkler system, necessitating the use of an impractical system of lakes. Seller also failed to inform buyers that increased border patrol enforcement activity in the area could seriously impair the labor supply for orchard work, which in fact is what occurred. Similar misrepresentations and omissions were made concerning the pH factor of the orchard's soil and the growth potential of the apple trees.

    ▆▆▆ Seller further contends that buyers did not reasonably rely on his representations, barring a finding of fraud under A.R.S. Sec. 44–1991. A presence of the nine elements of common law fraud are not essential to establishing a violation of this section. *State v. Superior Court of Maricopa County*, 123 Ariz. 324, 599 P.2d 777 (1979). Under the circumstances of this case, we are persuaded by the general rule that unlike common law fraud, reliance upon a misrepresentation is not an element of this antifraud provision of our securities laws. *N. Sims Organ & Co. v. S.E.C.*, 293 F.2d 78 (2nd Cir. 1961), cert. den. 368 U.S. 968, 82 S.Ct. 440, 7 L.Ed.2d 396 (1962); 69 Am.Jur.2d Securities Regulation—Federal Sec. 476 (1973). There was sufficient evidence to support the trial court's finding that appellee Dobras' trip to Washington did not enable him to discover the defects in seller's Arizona orchard operation.

    ▆▆▆ In addition, buyers adequately tendered back the signed agreements in a timely fashion. Where a purchaser seeks rescission of an unlawful sale of securities, the general view is that tender to the issuer or to the court at the commencement of the action is sufficient. See *Bullard v. Garvin*, 1 Ariz.App. 249, 401 P.2d 417 (1965); 69 Am.Jur.2d Securities Regulation—State Sec. 101 (1973). Buyers tendered the contracts to seller at the time of trial. There was no evidence that they delayed in electing the remedy of rescission to see if avoidance or affirmance would be more profitable to them.

The final issue we need address is whether the trial court erred in failing to allow seller any offsets in returning the parties to their prior positions. Seller contends that first, since he reinvested most of what buyers paid him into the orchard, it would be inequitable to force him to repay their consideration; and secondly, that he should be allowed offsets for the reasonable rental value of buyers' land while they owned it, *for the reasonable value of his management* services, and for the value of sprinkler parts he alleged were delivered to buyers.

We find no merit in either argument. There was evidence that although seller did reinvest most of buyers' money, the investment benefitted the orchard as a whole, which seller later sold to a third party for personal profit. The fact that the funds were reinvested into the orchard, instead of going directly to seller, does not mean that buyers may not recover the whole amount they paid for the fraudulent investment contracts. *Repass v. Rees*, 174 F.Supp. 898 (D.Colo.1959). Further, we defer to the discretion of the trial court in disallowing any offsets for the rental value of buyers' land, the value of seller's management services, and the sprinkler parts. *Spoon v. Walston & Co.*, 345 F.Supp. 518 (E.D.Mich.1972), aff'd 478 F.2d 246 (6th Cir. 1973). There was no proof offered as to the rental value of buyers' land while they possessed an interest in it. There was also no evidence that buyers acquiesced in the sale of the sprinkler parts on their land to the third party which purchased seller's interest in the entire orchard.

Because of our disposition of the securities issue, there is no need to address the other issues presented by seller. We find no abuse of discretion in the trial court's award of attorneys' fees pursuant to A.R.S. Sec. 44–2001.

Affirmed.

HOWARD and RICHMOND, JJ., concur.