724 P.2d 1242

Mark SULLIVAN, an individual, and Harry and Helen M. Sullivan, husband and wife, Plaintiffs/Appellants/Cross-Appellees,

v.

METRO PRODUCTIONS, INC., a California corporation; Producers' Liaison Corporation, an alleged Delaware corporation; Michael and Patricia Kathleen Miller, husband and wife; Ralph and Jean Smith, husband and wife, Defendants/Appellees/Cross-Appellants.

No. 2 CA–CIV 5568.

Court of Appeals of Arizona,
Division 2, Department A.

March 20, 1986.

Review Denied Sept. 9, 1986.

Teilborg, Sanders & Parks, P.C. by J. Clayton Berger, Phoenix, for plaintiffs/appellants/cross-appellees.

Fennemore, Craig, von Ammon, Udall & Powers by Timothy Berg, William L. Thorpe and Douglas A. Blaze, Phoenix, for defendants/appellees/cross-appellants.

Robert K. Corbin, Atty. Gen. by Patrick M. Murphy, Frank L. Murray and Eileen W. Hollowell, Phoenix, amicus curiae on Arizona Racketeering Act Treble Damage Issue Only.

## OPINION

FERNANDEZ, Judge.

Appellants Harry, Helen and Mark Sullivan appeal from the trial court's ruling that they are entitled to actual damages only, contending that the Arizona Racketeering Act, and specifically A.R.S. § 13–2314(A), requires that they be awarded treble damages. Appellees Metro Productions, Inc., Producers' Liaison Corporation, Michael and Patricia Miller and Ralph and Jean Smith (hereafter "Metro"), have cross-appealed, contending that the trial court erred in denying their motion to dismiss for lack of jurisdiction and in granting partial summary judgment in favor of the Sullivans because disputed issues of material fact exist.

In November 1978, Mark Sullivan entered into a production service agreement with Metro Productions under which Metro produced a 30–minute master videotape of one episode of a 65–program series called "The Sam Diego Show." Shortly thereafter, Harry and Helen Sullivan signed a production service agreement for the purchase of two videotape episodes of "The Sam Diego Show." Each tape was sold at a cost of $100,000. For each tape, the Sullivans paid $8,000 down and signed a promissory note for the balance of $92,000. The notes called for interest-only payments of $2,400 per year for five years and for certain payments on the principal to be made from income generated by distribution of the tapes to various television stations and TV cable networks throughout the world. The promissory notes were due in five years, but with the payment of $1,000 in the fifth year, the promissor could extend the note and convert it to a non-recourse note so that any additional principal payments could be obtained only from revenues earned from distribution of the tape.

The agreement provided that the master videotape was to be stored at the purchaser's expense in a vault to be obtained by Metro Productions. The purchaser signed a financing statement which created a security interest in the tape. The vault stor-

age master agreement provided that the purchaser could not remove the tape from storage without Metro Production's written consent until the promissory note was paid in full.

The production service agreement also provided that the purchaser would contact a management consulting firm within 14 days of signing the agreement to "help Owner [purchaser] in the selection of a distributor for the purpose of exhibiting the Tapes in all media." It further provided: "Owner also warrants that he will engage a management consulting firm within thirty (30) days of contract date." Metro Production's brochure stated as follows:

"After determining which tapes you desire to have produced for you, and after you have executed a Production Services Agreement, it will then be necessary for you to take the initiative to engage a Management Services Group, which will act as your agent to obtain a Distributor to market your television video tapes. There is a Management Service Group specializing in handling the placement and exploitation of video tape masters, which is accessible by telephone."

The Sullivans signed a management and service agreement with Investors Management Services, Inc., a Connecticut corporation, as did all the other purchasers of Metro's tapes. Neither Metro Productions nor its officers and shareholders hold an interest in Investors Management Services.

The management agreement was for a period of five years. There was no provision for any earlier termination date. The agreement refers to the production service agreement between the Sullivans and Metro Productions and directs all payments to be made to Metro Productions. It also states: "Owner acknowledges that Manager did not solicit Owner's business but that the Owner sought the services of the Manager." To date no revenues have been received from the Sullivans' tapes nor have any episodes of "The Sam Diego Show" been televised. Metro Productions apparently sold in the same manner nearly 1,000

episodes of various programs on subjects such as sewing, cooking, diet and health, coping with life and game shows.

The Sullivans learned of the investment from their accountant, James Allen, who in turn had learned of it from another client. Allen spoke to the salesman, Duane McCleary, about the investment, and McCleary agreed to pay Allen's expenses for the two of them to travel to Los Angeles to discuss it with Miller and Smith, the sole shareholders and officers of Metro Productions and Producers' Liaison. McCleary is apparently an employee of Rennert Investment Company of Utah, a company which entered into an agreement with Producers' Liaison to solicit purchasers for Metro's tapes. McCleary agreed to pay Allen $400 for each person Allen introduced to McCleary who entered into a production service agreement. Six of Allen's clients, including the Sullivans, entered into agreements with Metro Productions.

The Sullivans purchased the investment as a tax shelter. Included in the brochure on the investment were projected tax savings over the life of the promissory note and various comments about depreciation and investment credits to be taken by the purchasers. After the Internal Revenue Service disallowed their deductions, the Sullivans sued.

The complaint was filed in January 1983, and sought rescission of the agreements and return of the Sullivans' money because of violations of Arizona securities laws in the sale of unregistered securities by unregistered salesmen, damages for fraud and violations of the Consumer Fraud Act, and treble damages under the Arizona Racketeering Act (RICO). A partial summary judgment was entered in September 1984 in favor of the Sullivans on the racketeering act violations, with the court finding that the agreements are securities that are not exempt from registration. It is undisputed that neither Metro Productions nor Producers' Liaison is a licensed broker/dealer and that neither McCleary nor Allen is a licensed securities salesman. The Sullivans were awarded actual dam-

ages of $48,485, pre-judgment interest, costs and $25,000 attorney's fees. The remaining causes of action were then dismissed, and this appeal and cross-appeal followed. We address the cross-appeal issues first.

## SUMMARY JUDGMENT MOTION

Metro contends the trial court erred in granting summary judgment to the Sullivans on their RICO count, insisting that fact issues exist. The trial court found that the investment is a security. Since there was no dispute that the investment was not registered and that no salesman was licensed to sell securities, the court determined there had been a RICO violation. The only question on appeal then is whether the trial court was correct in its determination that the investment is a security or an investment contract.

The United States Supreme Court has established a three-prong test for determining whether the purchase of an interest is the purchase of an investment contract, *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), and that test applies in Arizona. *Rose v. Dobras*, 128 Ariz. 209, 624 P.2d 887 (App.1981). "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." 328 U.S. at 301, 66 S.Ct. at 1104.

Metro contends there are factual issues as to the existence of a common enterprise. "A common enterprise is one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." *S.E.C. v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 n. 7 (9th Cir.), cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973).

Metro contends that, since Metro Productions' only obligation under the production service agreement was to produce a one-half hour videotape program, there can be no common enterprise between it and the Sullivans. Appellees argue that, once the tape was delivered, Metro Productions' ob-

ligations ended. Although that statement is correct, it does not end the matter. The trial court observed in its minute entry ruling on the motion that "[b]ecause of the nature of the financing through which the programs were sold by Metro to the investors, profits would also flow to Metro, once the show was marketed." As we noted earlier in our statement of the facts of this case, the promissory note provided that payments on the principal would be paid to Metro from revenues earned by distribution of the tape. After the fifth year of the note, if the promissor paid $1,000, the note became a non-recourse instrument, so that the only way Metro would then receive full payment of the principal would be if distribution of the tape produced revenues. Hence, the fortunes of the Sullivans were interwoven with Metro's.

This case is not like that of *De Luz Ranchos Investment, Ltd. v. Coldwell Banker & Co.*, 608 F.2d 1297 (9th Cir.1979). There the purchaser assumed control over the parcels of land, and the seller retained no interest other than a deed of trust to secure payment. The court noted that the seller's contractual obligation ended with the transfer of title. In this case, the Sullivans did not have full control over the tape, since it was placed in storage and could not be removed until the promissory note was paid in full. In addition, any revenues received from distribution of the tapes were required to be paid directly to Metro Productions. The Sullivans thus lacked full control over any revenues received from the tapes. The trial court correctly found that appellees raised no genuine issue of material fact with regard to the existence of a common enterprise.

Metro also contends that a factual issue exists as to the third prong of the *Howey* test, that the buyer must have entered into the agreement with the expectation that any profits would come solely from the efforts of the seller or others. Appellees insist that the Sullivans did not make a passive investment, since the promotion brochure informed purchasers that they would have to distribute the tapes them-

selves or engage an agent to distribute them. The brochure makes several references to a purchaser's need to show he is not relying on a third party to make income for him.

 The Ninth Circuit, in *Turner Enterprises,* supra, noted that the word "solely" in the *Howey* test is not to be read as a literal limitation on the definition. That court held "we adopt a more realistic test, whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." 474 F.2d at 482. The emphasis in determining whether an investment is a security is on economic reality. *Tcherepnin v. Knight,* 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). Realistically, the only effort the purchasers made was to select an agent to handle distribution of the tapes. No other act was required nor expected of them. Although the brochure speaks in terms of the purchasers distributing the tapes themselves as though that were truly an option, the production service agreement requires the purchasers to hire an agent to handle distribution within 30 days of signing the agreement. Any revenues the purchasers realize from their investments would thus be the result of essential managerial efforts of others. The trial court found that the "investments were offered without regard to the experience or sophistication of the investors in the television industry. It was not intended or expected by Metro or its salesmen that the typical investor would attempt to market his tapes himself." Again, the trial court was correct in finding that no fact question existed on the third prong of the *Howey* test, and we affirm the summary judgment entered in favor of the Sullivans.

## PERSONAL JURISDICTION

Metro Productions moved to dismiss the complaint for lack of personal jurisdiction. Metro Productions initially filed an answer which did not contain an affirmative defense of lack of jurisdiction. It later filed a motion to dismiss and moved to amend its answer to include the defense. The motion to amend was granted after no opposition was filed. The motion to dismiss was denied after the court heard oral argument on the issue.

 We find that the evidence presented to the trial court supports its determination. The Sullivans' accountant, James Allen, testified at his deposition that he met in Los Angeles for a couple of hours with Miller and Smith, the sole shareholders and officers of both Metro Productions and Producers' Liaison, and discussed the investment in great detail. The Sullivans executed their contracts in Arizona and transmitted their down payment to Allen in Arizona who in turn transmitted it to either Metro Productions or to a salesman who represented Metro. Since Miller and Smith clearly acted with the intent to induce Allen to obtain purchasers of the tapes in Arizona, and since that inducement resulted in six agreements with Arizona residents, we find no error in the court's ruling. *See Helicopteros Nacionales de Columbia v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Meyers v. Hamilton Corp.,* 143 Ariz. 249, 693 P.2d 904 (1984).

## RIGHT TO TREBLE DAMAGES

 The Sullivans sought treble damages in the trial court, claiming that they are mandated by A.R.S. § 13–2314(A). The trial court declined to award treble damages, citing no reason for its decision. Metro contends that the matter is discretionary with the trial court. The Attorney General has filed as amicus curiae in support of the Sullivans' position.

The statute provides as follows:

"A. A person who sustains injury to his person, business or property by racketeering as defined by § 13–2301, subsection D, paragraph 4 or by a violation of § 13–2312 may file an action in superior court for the recovery of treble damages and the costs of the suit, including reasonable attorney's fees. The state may file an action in behalf of those persons

injured or to prevent, restrain, or remedy racketeering as defined by § 13–2301, subsection D, paragraph 4 or a violation of § 13–2312."

The issue presented is apparently one of first impression in this state. Subsection A of the statute permits a person who is injured by racketeering activity to file a civil action for damages. The word "may" is an auxiliary verb to the verb "file" and serves to permit the private cause of action. The statute does not read "may file an action and may recover treble damages," an inference Metro would have us draw. It clearly indicates that a successful plaintiff is entitled to treble damages, costs of suit and reasonable attorney's fees.

■ Metro also contends that the language of subsection D, authorizing the trial court to issue any of a number of enumerated orders, renders an award of treble damages discretionary, since one of the enumerated orders is the payment of treble damages to injured persons. The introductory language of subsection D, however, states that the court "may" issue orders because orders that are appropriate in one case may not be appropriate in others. The court is thus granted discretion to determine which of the listed orders is appropriate in a given case. That language does not affect the requirement that a successful plaintiff be awarded treble damages.

Finally, Metro contends the award of treble damages is discretionary because a similar statute, A.R.S. § 23–355, has been held to confer discretion as to the award of treble damages. *Abrams v. Horizon Corporation*, 137 Ariz. 73, 669 P.2d 51 (1983). That statute permits an employee to recover treble damages from an employer who fails to pay wages due the employee. Contrary to appellees' assertion, however, the statutes are not that similar. A.R.S. § 23–355 provides that an employee "may recover" treble damages. Thus, the award is discretionary with the court. There is no such wording in the statute before us.

■ We hold that the trial court erred in awarding the Sullivans only actual damages. The judgment is modified to include treble damages and is otherwise affirmed. The appellants will be awarded attorney's fees on appeal as requested upon filing a statement of costs pursuant to Rule 21(c), Rules of Civil Appellate Procedure, 17A A.R.S. (1985 Supp.), and *Schweiger v. China Doll Restaurant, Inc.*, 138 Ariz. 183, 673 P.2d 927 (App.1983).

HATHAWAY, C.J., and HOWARD, P.J., concur.