733 P.2d 1142

**Charles DAGGETT, an individual, Plaintiff-Appellant, Cross Appellee,**

v.

**JACKIE FINE ARTS, INC., a Florida corporation; Herman Finesod, an individual; Sigmund Rothschild, an individual, Defendants-Appellees, Cross Appellants.**

**No. 1 CA–CIV 8231.**

Court of Appeals of Arizona, Division 1, Department C.

Nov. 20, 1986.

Reconsideration Denied Jan. 5, 1987.

Review Denied March 11, 1987.

Teilborg, Sanders & Parks, P.C. by J. Clayton Berger, Phoenix, for plaintiff-appellant, cross appellee.

Burch & Cracchiolo, P.A. by Stephen E. Silver, Scott D. Crowell, Phoenix, for defendants-appellees, cross appellants.

## OPINION

EUBANK, Presiding Judge.

This appeal involves the Arizona Racketeering Act, A.R.S. § 13–2301, *et seq.*, (Rico), and whether the treble damages provision contained in A.R.S. § 13–2314 requires that the trial court award a successful plaintiff in a civil action treble damages. The cross-appeal questions whether the admitted facts established a "security" sufficiently to support an award of summary judgment.

Appellant, · Charles Daggett (plaintiff) filed his complaint against appellee-defendant and cross-appellant Jackie Fine Arts, Inc,, and others (Jackie) alleging multiple counts of fraud and securities violations. Count IV of the complaint was based on A.R.S. § 13–2314, the Arizona Rico statute. Following discovery, plaintiff moved for summary judgment on the Rico count. The trial judge granted plaintiff's motion but, after reconsideration, refused to grant him treble damages. Plaintiff appeals from the denial of treble damages. Jackie cross-appeals from the summary judgment contending that it was improper because genuine issues of material fact exist relating to the factual determination that the transactions constituted a "security" or an "investment contract," as defined by A.R.S. § 44–1801(19).

The basic facts are not in dispute. Plaintiff, who was a contractor in the construction industry, without knowledge or experience in art or the art business, executed a purchase agreement with Jackie, through Jackie's agent, Charles E. Orr, Jr., for the purchase of an "Art Master" for $136,000. The purchase price consisted of cash on closing in the amount of $3700, a promissory note in the amount of $5550, at 8% annual interest, due by October 1, 1979, a second promissory note in the principal amount of $9,250, at 8% annual interest, due by February 1, 1980, and a third promissory note representing the deferred balance of the purchase price in the principal amount of $117,500, at 6% annual interest, due on January 15, 1991. This last note is secured by a security agreement executed by plaintiff and Jackie wherein plaintiff's personal liability is limited to $45,000. This note is described in Jackie's material as a non-negotiable partial recourse note. All of these documents and others were executed as part of a "package" on the same date, June 29, 1979.

The art master was designed basically as a tax shelter. In Jackie's Information Memorandum For the Sale of Art Masters, dated April, 1979, it describes its product as follows:

Jackie Fine Arts markets art masters, each consisting generally of silkscreen mylars, lithographic plates and mylars,

or photoscreen negatives of an original work of art, together with related copyrights. The artist has agreed to cooperate in the production of 100 to 300 limited edition graphics from the art master, which will be signed and numbered by the artist. The art master purchaser will pay for the costs of production of these graphics.

It also describes the tax considerations of purchasing such a product in these terms:

Jackie Fine Arts has received opinions of its counsel, Meserve, Mumper & Hughes, Los Angeles and Chadbourne, Parke, Whiteside & Wolff, New York, concerning tax matters, which are attached as Exhibits. Subject to the discussion contained therein, the opinions conclude that a purchaser is entitled to a 10% investment tax credit and accelerated depreciation deductions based on the entire purchase price of the art master. A purchaser who properly elects the accrual method of accounting for his trade or business of exploiting the art master is also entitled to currently accrue interest deductions on his notes, including the partial recourse note, and a cash basis taxpayer is entitled to a deduction for interest actually paid. The investment credit available to the purchaser of an art master is not affected by the "at risk" limitation contained in the Code; however, losses incurred in the venture are subject to that limitation. A cash payment made by a purchaser, and all notes as to which the purchaser is personally liable, including the recourse portion of the partial recourse note, qualify as amounts at risk. Accordingly, purchasers of art masters will be allowed to deduct losses up to the total of those amounts. The availability of a substantial portion of these tax benefits depends on a factual determination that the purchaser is acquiring the art master with the intent to engage in the business of exploiting the art master in order to make a profit (aside from tax benefits), and that the purchase price is at least equal to the fair market value of the art master. . . .

The Informational Memorandum contains the two extensive legal opinions by the law firms as indicated.

As a part of the purchase agreement, plaintiff selected the art master entitled "Wild Geese" created by artist Allen Friedman. Two appraisals were contained in the package, also dated June 29, 1979, valuing "Wild Geese" at $145,000 and $165,000 fair market value. Following the sale of an art master, Jackie made all the arrangements with a printer to produce a limited edition of prints. The plaintiff paid Jackie an additional $3,500 for such arrangements and printing.

In plaintiff's affidavit supporting his motion for summary judgment, he states:

4. I made my investment with Jackie Fine Arts, Inc. based upon the representations of Jackie and its agents, including the man who sold the Jackie program to me, Charles Orr, that all distribution and marketing of the art print would be handled by third parties and that my only involvement with the investment would be to pay for the art master in accordance with the terms of the Jackie program and to choose a distributor from among the list of those distributors supplied by Jackie. I was advised that these distributors were available and that they would handle all the actual details of marketing and distributing the print itself without any involvement on my part.

5. It was always my understanding that I would be a passive investor at all times. It was never my intention to actively participate in the marketing and distribution of the art master, and I had no knowledge or experience in that area, and would have been totally unable to do so on my own.

6. Jackie or its agents supplied me with a list of distributors and a form contract for use in retaining the services of a distributor. That material was sent to me unsolicited and was part of the Jackie package.

7. I have paid a total of $21,950.00 to Jackie in conjunction with the purchase of the art master and the preparation of

the limited edition of 200 art prints. I have been totally unable to sell any of the art prints, and I have never received any income return on my investment or any revenues or profits as a result of my investment. As a result, I have considered my entire investment to be lost.

8. As a result of my investment in Jackie and based upon the representations made to me by Jackie and its agents, I filed a Schedule C with my personal income tax returns for the years 1977 on, which showed substantial losses which were taken in accordance with the instructions given me by Jackie. Subsequently, I was audited by the Internal Revenue Service, which I am informed has classified the Jackie Fine Arts, Inc.'s program as an abusive tax shelter. As a result of the audit, I was assessed tax deficiencies for the years 1977 through 1980 in the amount of $20,-323.60, plus accrued interest at the IRS rate.

9. I was advised that Jackie had retained the law firm of Friedman and Shaftan to defend investors such as myself in the event of an assessment by the Internal Revenue Service. I utilized the services of Friedman and Shaftan for such a defense. Subsequently, I was advised by Friedman and Shaftan that the Internal Revenue Service agreed to allow me to deduct only my out-of-pocket costs as a theft loss and to disallow any additional losses as shown on my tax returns. Based upon their advice and the advice of my counsel, J. Clayton Berger, I agreed to settle the case with the IRS on that basis. As a result, it was necessary for me to pay the sum of $20,-323.60, plus interest. I was advised by the Internal Revenue Service that they had filed a tax lien on my residence, and that they would foreclose the tax lien and evict me from my home if I did not pay off the taxes. Consequently, it was necessary for me to refinance my home in order to pay the Internal Revenue Service the amount due.

10. Although I received two appraisals from appraisers retained by Jackie showing that the art print was worth $136,000.00 or more, the art print was submitted to the Art Print Advisory Panel of the Internal Revenue Service for valuation in conjunction with the audit of my income tax returns. The Art Print Advisory Panel, which I am informed consists of nationally recognized art print experts, has valued the art print at $0.00 and based upon my interpretation of their appraisal, the art master sold to me by Jackie has absolutely no commercial value whatsoever.

The vice-president of Jackie filed a counteraffidavit which denied that Jackie had any economic interest in the success of plaintiff's art master, and stated in part:

7. Jackie's role in Charles Daggett's [plaintiff] efforts to commercially exploit his art master consisted solely of selecting a nonaffiliated printer for initial production of limited-edition prints. Charles Daggett, however, was free to select any printer of his choice and all printing costs were paid by him.

8. Charles Daggett was free to utilize any distributor to distribute art products produced from his art master or to distribute the art products himself.

9. At Charles Daggett's request, Jackie furnished him with a list of art distributors. None of the distributors contained in the list were recommended by or affiliated with Jackie.

10. Jackie has not made any business decisions with regard to Charles Daggett's commercial exploitation of his artwork, and Jackie has not borne any of the costs of promotion or distribution of Charles Daggett's art master.

11. The marketing success of Charles Daggett's art products is wholly independent of the success of the purchasers of other artwork from Jackie.

The effect of Jackie's affidavit is to dispute that it was involved in the distribution phase of the package or that Jackie had any economic interest in the success or failure of plaintiff's art master.

The trial court, after considering the cross-motions for summary judgment, awarded plaintiff summary judgment in the sum of $32,765.52, together with attorney's fees of $12,254 and $726.53 costs. The judgment also states:

> The Court ... concludes that the Purchase Agreements sold by the Defendants [Jackie] were securities. Those securities were not exempt from registration. The sale of those securities to the Plaintiff involved the sale of an unregistered security and was in violation of A.R.S. § 13–2301(D)(4)(s). The sale of those securities involved unregistered salesmen, which is also a violation of A.R.S. § 13–2301(D)(4)(s).

The Court also stated in its minute entry that the transaction was an investment contract.

## I. THE CROSS APPEAL

Since the cross-appeal questions the efficacy of the summary judgment, we will consider Jackie's contentions first.

■ The threshold issue is whether there are questions of fact which would preclude summary judgment. Summary judgment is appropriate only when there are no genuine disputes as to any material fact and the moving party is entitled to judgment as a matter of law. *Lundy v. Prescott Valley, Inc.*, 110 Ariz. 362, 519 P.2d 61 (1974); Rule 56(c), Arizona Rules of Civil Procedure. In reviewing a summary judgment a court must resolve any doubt in favor of the losing party, viewing all facts and inferences in a light most favorable to that party. *Farmers Ins. Co. of Arizona v. Vagnozzi*, 138 Ariz. 443, 675 P.2d 703 (1983). This does not mean, however, that any factual issue automatically requires trial. A factual issue warrants trial only if it is material to a determination of law, it is genuinely in dispute, it is specifically supported by affidavit or otherwise, and it is properly raised before the trial court in the motion for summary judgment. Rule 56(c), Arizona Rules of Civil Procedure. Here Jackie concedes that whether or not the purchase agreement constitutes a security

is a question of law. *United States v. Carman*, 577 F.2d 556, 562 (9th Cir.1978). Jackie's cross motion for summary judgment and opposition to Daggett's motion for summary judgment in the trial court asserts only one factual issue in dispute: whether Jackie paid less to the artist than the amount represented to Daggett. Although disputed, Jackie fails to demonstrate why this factual issue is material to a determination of whether the purchase agreement is or is not a security. It may have had some relevance to the five other counts before the trial court but it is immaterial to the summary judgment issue under consideration here.

■ Jackie raises additional issues of fact in its briefs on appeal that were not raised in the trial court. Jackie cannot dispute material facts in this court that were not raised and disputed in the trial court. A party opposing a motion for summary judgment has the burden of showing the trial court that an issue of fact exists and must offer specific facts in opposition to the motion for summary judgment. *Nyberg v. Salt River Project Agr. Imp. and Power Dist.*, 91 Ariz. 397, 372 P.2d 727 (1962); *Brand v. Dolgin*, 17 Ariz.App. 154, 496 P.2d 144 (1972). Moreover, in addressing the liability issue, we find that these additional issues of fact were either immaterial or not in genuine dispute. Therefore, we find no factual issue presented and preserved on appeal which would have precluded the trial court from granting summary judgment.

■ Plaintiff's claim is based on A.R.S. § 13–2314(A), which provides a remedy for one who sustains an injury by Racketeering as defined by A.R.S. § 13–2301(D). A.R.S. § 13–2301(D)(4)(s) defines Racketeering to include the sale of unregistered securities by an unregistered dealer or salesman. It should be noted that unlike the Federal Anti-Racketeering statute, 18 U.S.C. §§ 1961–1968 (1976 & Supp. IV 1980), Arizona's Rico does not necessarily require that a defendant maintain an interest in, or control of, an enterprise in order to allow a remedy for a plaintiff. Note,

*Anti-Racketeering-Expanding the Most Expansive Rico Law in the Nation,* 1984 Ariz.St.L.J. 397. Although Arizona's Rico permits recovery of damages for harm resulting from enterprise involvement, a plaintiff can also recover damages where a defendant commits a predicate offense, as enumerated by A.R.S. § 13–2301(D)(4), for financial gain and the predicate offense is punishable by imprisonment for more than one year. Therefore, Arizona Rico applies to individuals and companies who merely commit predicate offenses as well as to organized crime groups. *See State ex rel. Corbin v. Pickrell,* 136 Ariz. 589, 667 P.2d 1304 (1983). This is exactly the situation in the instant case, the alleged predicate offense being Jackie's sale of an unregistered security by an unregistered salesman to plaintiff.

■ It is undisputed that the art master purchase agreement was not registered as a security and that Jackie's sales agents were likewise unregistered. Thus, the main point of contention on liability remains whether the art master purchase agreement constitutes a security under Arizona law. The applicable state statutory definition of a security specifically includes an investment contract. A.R.S. § 44–1801(19). This definition is patterned after, and is virtually identical to, the federal statutory definition found at 15 U.S.C. § 77b. We therefore look to federal interpretations of securities law for guidance. *Rose v. Dobras,* 128 Ariz. 209, 624 P.2d 887 (App.1981); *Greenfield v. Cheek,* 122 Ariz. 70, 593 P.2d 293 (App.1978), *aff'd,* 122 Ariz. 57, 593 P.2d 280 (1979). Indeed, the test adopted by Arizona courts to determine whether a given transaction is an investment contract is the test established in *S.E.C. v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed 1244 (1946), defining investment contract pursuant to the federal statute. *Rose v. Dobras, supra.* The U.S. Supreme Court in *Howey* defined an investment contract as a transaction where: (1) an individual is led to invest money (2) in a common enterprise (3) with the expectation that he will earn a profit solely through the efforts of others. *Id.*

Initially, we note that an objective standard is employed in applying the *Howey* test. *S.E.C. v. Aqua-Sonic Product Corp.,* 524 F.Supp. 866 (S.D.N.Y.1982), *aff'd* 687 F.2d 577 (2d Cir.1982), *cert. denied* 459 U.S. 1086, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982). Therefore, what actually occurred, or in speculation what could have occurred, following the transaction is immaterial. The transaction must be characterized at the time when it transpired. *Id.* at 876.

In the instant case, the record before us is devoid of any evidence regarding plaintiff's efforts to market and distribute the art master or its products. In any event, the first prong of the *Howey* test is met in the instant case. Plaintiff made an investment of money in Jackie. It is the second and third prongs of the *Howey* test that are in dispute.

Plaintiff states that the second prong of the *Howey* test is insignificant in determining whether a transaction constitutes an investment contract and that courts generally will disregard the second prong if the third prong has been met. We reject this assertion. Although the decisions in most of the cases turn on the satisfaction of the third prong, we have found no case which ignores the second prong. Without the second prong the *Howey* test would otherwise characterize as securities numerous everyday transactions not intended to be subjected to securities regulation.

■ Two tests have been developed to determine the existence of a common enterprise in order to satisfy the second prong of the *Howey* test: (1) the horizontal commonality test and (2) the vertical commonality test. *See, Mordaunt v. Incomco,* 686 F.2d 815 (1982). Horizontal commonality requires a pooling of investor funds collectively managed by a promoter or third party. *Hirk v. Agri-Research Council, Inc.,* 561 F.2d 96 (7th Cir.1977). Vertical commonality requires a positive correlation between the success of the investor and the success of the promoter, without requiring a pooling of funds. *Brodt v. Bache & Co.,* 595 F.2d 459 (9th Cir.1978). Various state

and federal jurisdictions have required satisfaction of one or both of the commonality tests. Arizona courts have not indicated a preference for one over the other. In *Rose v. Dobras, supra*, the only Arizona case to address commonality, both tests were met and therefore Division 2 of our court did not reach this question. It is our opinion that satisfaction of either test should suffice to meet the requirements of the common enterprise prong of the *Howey* test. Although horizontal commonality exhibits a common enterprise, we reject the tests' strict requirement of a pooling of funds for the reasons outlined by the Ninth Circuit of the U.S. Court of Appeals in *Brodt v. Bache & Co. Inc., supra.*

■ In the instant case, horizontal commonality does not exist and is not an issue. We do find, however, that vertical commonality is present. A review of the transaction as presented by both parties clearly indicates that Jackie's success was dependent on the success of the investor. As outlined above, the third note executed by plaintiff in favor of Jackie was partly nonrecourse. In addition, plaintiff executed an assignment of net receipts whereby he was required to make prepayments on the note in annual installments to the extent of 50% of his net receipts from the exploitation of the art master. Therefore, if plaintiff's investment was a success, Jackie would receive payment on the note for both the recourse and nonrecourse portions. However, in the event plaintiff's investment failed, at maturity Jackie would not receive payment on the nonrecourse portion of the note. Given such an event Jackie's only remedy would be foreclosure on its security interest in the art master. Thus, by virtue of the structure of the agreement, Jackie is inextricably interested in the success or failure of the plaintiff's investment. Therefore, since Jackie's interest does not end upon consummation of the purchase agreement, there exists a positive correlation between the success of the investor and the success of the promoter. Hence, a common enterprise does exist. *Sullivan v. Metro Productions, Inc.*, 150 Ariz. 573, 724 P.2d 1242 (App.1986).

Jackie disputes this analysis, claiming it had no economic interest in plaintiff's investment because Jackie, by prior contract with the artist, assigned its right to the payments on the third note to the artist. Assignment of the third note, however, is incidental to Jackie's interest to plaintiff's success. The plaintiff was not a party to Jackie's purchase option agreement with the artist. Jackie voluntarily chose to satisfy its obligation to the artist by assignment of plaintiff's note. This in no way affects the transaction between Jackie and plaintiff. Jackie cannot unilaterally change the character of the transaction by merely assigning away its interest. Although Jackie cites numerous cases to buttress its position, it assumes in every instance that the "flow through" of revenue to the artist eliminates its interest in plaintiff's investment. Interpretation of the written instruments, however, is a question of law. We have reviewed the instruments and based on them find that they unequivocally create a common enterprise between Jackie and plaintiff in satisfaction of the second prong of the *Howey* test.

■ The third prong of the *Howey* test requires that profits be derived solely from the entreprenurial or managerial efforts of others. The efforts of others must be those which affect the failure or success of the investment. *S.E.C. v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir. 1973). However, it is not necessary, as Jackie contends, that the efforts be those of the promoter. *Continental Marketing Corp. v. S.E.C.*, 387 F.2d 466 (10th Cir. 1967). It is undisputed that Jackie made all the production and printing arrangements for the limited edition of prints; that Jackie was to provide tax assistance if the Internal Revenue Service challenged the investor; and that Jackie provided plaintiff with a list of distributors, a form letter to contact the distributor, and a sample distribution agreement. Throughout the information memorandum and fact sheet that Jackie used to solicit investments, it was strongly suggested that purchasers employ

an experienced distributor. In discussing the marketing and distribution of art masters, Jackie's material assumes a third party distributor is to be used. However, Jackie claims that the transaction did not require plaintiff to use a distributor but that plaintiff was free to market the art master himself. Although this is true, at the time the transaction occurred Jackie knew or should have known that the facts and circumstances prohibited plaintiff's involvement with the art master beyond merely choosing a distributor. Plaintiff owned and operated a construction company. He had no knowledge of art and possessed no experience in the art industry. Jackie characterized the art master as an investment. Jackie through its promotional materials and agents persuaded plaintiff to believe he only needed to purchase the art master and choose a distributor in order to reap profits and tax benefits. *Compare, Continental Marketing Corp. v. S.E.C.,* 387 F.2d 466 (10th Cir.1967), *cert. denied,* 381 U.S. 905, 88 S.Ct. 1655, 20 L.Ed.2d 419 (1968) (where investors were persuaded "that all they needed to do was buy the beavers, pay the ranching fees, and reap geometric profits," and in which the court found that defendants engaged in offer and sale of securities in form of investment contract). In addressing the third prong of the *Howey* test, Division 2 in *Rose v. Dobras, supra,* stressed the importance of economic reality in evaluating transactions for purposes of securities laws. The theoretical possibility that an investor would refuse the efforts of others is not fatal to a determination that profits are to be earned from third party efforts. *See S.E.C. v. Aqua-Sonic Products Corp., supra; Sullivan v. Metro Productions, Inc., supra.* The focus is on whether the typical investor would accept third party efforts. *Id.* In this respect, the representations made by Jackie including promotional and contractual materials, are critical. *American Gold and Diamond Corp. v. Kirkpatrick,* 678 P.2d 1343 (Alaska 1984). Viewing the undisputed facts in this light it is clear that the success of plaintiff's investment was inescapably tied to the efforts of others.

Plaintiff was never in a position to market the art master himself. Although he was not strictly obligated to rely on the efforts of others, economic reality would require just that. For this reason we distinguish *Mr. Steak, Inc. v. River City Steak, Inc.,* 324 F.Supp. 640 (D.Colo.1970), *modified,* 460 F.2d 666 (10th Cir.1972). In *Mr. Steak* the investor entered into a franchise contract with a franchisor and a management contract with a third party, who had been recruited and trained by the franchisor. The court found that the third prong of the *Howey* test was not satisfied. However, the economic realities found there were that the investor retained some power over the conduct of the business, and that the investor did not lack the knowledge, skill or expertise necessary to operate the franchise. Those are not the economic realities present in the instant case.

The facts in *S.E.C. v. Aqua-Sonic, supra,* are remarkably similar to those before us. In *Aqua-Sonic,* the promoters were selling licenses to purchasers, giving purchasers territorial market rights to sell Aqua-Sonic dental products. The transaction provided that purchasers purchased the rights by a combination of cash and notes. The bulk of the purchase price was accommodated by a nonrecourse note. The agreement required prepayment of this note by a percentage of any proceeds from the sale of Aqua-Sonic products. An information memorandum was provided that included tax opinions, market information, product information and illustrations. The promotional materials referred purchasers to Ultrasonic, a sales agency that would perform all significant marketing functions. Use of Ultrasonic was optional, however, and purchasers were told they could market the products themselves if they wished. The agreements were portrayed as tax sheltered investments and marketed to persons with no knowledge or experience in selling dental products, including business executives, a petroleum jobber, a dentist, a farmer, a computer analyst, a schoolteacher, a school principal, a physical therapist and various retirees. The defendant, there, conceded all but the

third prong of the *Howey* test. The court held that the economic realities were such that purchasers had to use the efforts of third parties to successfully market the dental products. Accordingly, the license agreements were deemed investment contracts subject to securities laws.

■ Jackie heavily relies on a document entitled "purchaser's questionnaire" which is part of the "package" executed on June 29, 1979, to show that plaintiff did not intend to rely on the efforts of others. The "purchaser's questionnaire" is a form document prepared by Jackie and signed by plaintiff wherein plaintiff purportedly denies any reliance on Jackie in selecting art master, or that Jackie advised him as to the manner of exploiting art master. This document attempts to directly contradict the economic realities of the entire transaction. Since the document is part of the June 29, 1979 purchase agreement package, its interpretation is a question of law. The promotional material emphasized the tax shelter benefits of the art master program. It was aimed at wealthy individuals seeking a passive tax sheltered investment. Jackie characterized the transaction as an investment. The typical investor had no interest in, and was not capable of exploiting their art master, but was interested in a tax shelter investment to reduce income taxes. Thus, Jackie was marketing tax sheltered investment packages to high income individuals who were required to know nothing about art and who would merely make payments, choose a distributor, and hope to reap the tax shelter benefits. Thus, as a matter of law the "purchasers' questionnaire" can only be viewed as an attempt by Jackie to eliminate possible false representation or fraud claims. Since this is not a question under Rico, it does not preclude summary judgment.

In viewing the art purchase agreement, we find that it is an investment contract security unexempt from Arizona securities laws. Thus, we agree with the trial judge's summary judgment.

## II. DIRECT APPEAL

Plaintiff appeals from the trial court's denial of treble damages to him. He contends that A.R.S. § 13–2314 requires that the trial court award to a successful plaintiff, in a civil Rico action, treble damages. We agree.

This same issue was addressed by Division 2 of this court in *Sullivan v. Metro Productions, Inc.,* 150 Ariz. 573, 724 P.2d 1242, 1246–47 (1986). Under facts very similar to the instant case, the court of appeals affirmed the Rico summary judgment by applying the *Howey* test, and awarded plaintiff treble damages. The court said:

The statute [A.R.S. § 13–2314(A)] provides as follows:

"A. A person who sustains injury to his person, business or property by racketeering as defined by § 13–2301, subsection D, paragraph 4 or by a violation of § 13–2312 may file an action in superior court for the recovery of treble damages and the costs of the suit, including reasonable attorney's fees. The state may file an action in behalf of those persons injured or to prevent, restrain, or remedy racketeering as defined by § 13–2301, subsection D, paragraph 4 or a violation of § 13–2312."

The issue presented is apparently one of first impression in this state. Subsection A of the statute permits a person who is injured by racketeering activity to file a civil action for damages. The word "may" is an auxiliary verb to the verb "file" and serves to permit the private cause of action. The statute does not read "may file an action and may recover treble damages," an inference Metro would have us draw. It clearly indicates that a successful plaintiff is entitled to treble damages, costs of suit and reasonable attorney's fees.

Metro also contends that the language of subsection D, authorizing the trial court to issue any of a number of enumerated orders, renders an award of treble damages discretionary, since one of

the enumerated orders is the payment of treble damages to injured persons. The introductory language of subsection D, however, states that the court "may" issue orders because orders that are appropriate in one case may not be appropriate in others. The court is thus granted discretion to determine which of the listed orders is appropriate in a given case. That language does not affect the requirement that a successful plaintiff be awarded treble damages.

Finally, Metro contends the award of treble damages is discretionary because a similar statute, A.R.S. § 23–355, has been held to confer discretion as to the award of treble damages. *Abrams v. Horizon Corporation*, 137 Ariz. 73, 669 P.2d 51 (1983). That statute permits an employee to recover treble damages from an employer who fails to pay wages due the employee. Contrary to appellees' assertion, however, the statutes are not that similar. A.R.S. § 23–355 provides that an employee "may recover" treble damages. Thus, the award is discretionary with the court. There is no such wording in the statute before us. 724 P.2d at 1246–47.

 We agree with *Sullivan* and hold that the trial court should have awarded plaintiff treble damages *sub judice.* Our holding comports with the legislative intent that Rico be a tool in combating the serious problems of white collar crime and in protecting its victims, such as the securities investor. *State ex rel. Corbin v. Pickrell, supra*, 136 Ariz. at 596, 667 P.2d at 1309.

We affirm the trial court's award of summary judgment to plaintiff; we reverse the denial of treble damages to plaintiff, and we remand to the trial court for entry of a new judgment awarding plaintiff his treble damages, attorney's fees and costs.

The plaintiff has also requested his attorney's fees on appeal and he is entitled to them. He may receive them by filing a statement of costs with the court, pursuant to Rule 21(c), Arizona Rules of Civil Appellate Procedure, 17A, A.R.S. (1985 Supp.), and *Schweiger v. China Doll Restaurant,*

*Inc.*, 138 Ariz. 183, 673 P.2d 927 (App. 1983).

SHELLEY and HAIRE, JJ., concur.