856 F.2d 1392
 RICO Bus.Disp.Guide 7037
 Loran L. GARVIN and Alice F. Garvin, husband and wife,
Carroll Garvin and Gale K. Garvin, husband and
wife, Plaintiffs/Appellants/Cross-Appellees,
v.
John A. GREENBANK, Defendant,
and
Joseph T. McDonald and Katharine McDonald, husband and wife;
James A. Barnes, a single man; J. McDonald &
Co., Ltd., an Arizona corporation,
Defendants/Appellees/Cross-Appellants.
 Nos. 87-2149, 87-2211.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 15, 1988.
Decided Sept. 12, 1988.
 
 Robert O. Dyer, Jennings, Kepner, & Haug, Phoenix, Ariz., for plaintiffs/appellants/cross-appellees.
 W. Charles Thomson, Gallagher & Kennedy, P.A., Phoenix, Ariz., for defendants/appellees/cross-appellants.
 Appeal from the United States District Court for the District of Arizona.
 Before FARRIS, WIGGINS and TROTT, Circuit Judges.
 TROTT, Circuit Judge:
 Loran L. Garvin, his wife Alice F. Garvin, Carroll Garvin, and his wife Gale K. Garvin ("appellants, cross-appellees") appeal the district court's grant of a judgment notwithstanding the verdict ("JNOV") in favor of Joseph T. McDonald, his wife Katharine McDonald, James A. Barnes, John A. Greenbank, and J. McDonald & Co., Ltd., an Arizona corporation ("appellees, cross-appellants"), as to Arizona civil racketeering claims in an action alleging federal and state securities violations, state civil racketeering violations, negligence, misrepresentation, and breach of fiduciary duty arising from the sale of units of participation in Refinery Holding Company ("RHC"). Appellees cross-appeal the district court's denial of a JNOV as to both the basis for and amount of damages awarded to the appellants on other counts. We reverse and remand as to the Arizona civil racketeering claims and uphold the district court's determination of damages as to the federal securities claim.
 FACTS AND PROCEEDINGS BELOW
 Loran L. Garvin and his brother, Carroll E. Garvin, owned and operated a sprinkler contracting business, Garvin Fire Protection Systems, Inc. ("GFPS"). Loran, as president, managed the Arizona operations while Carroll, as vice president, managed the California and Nevada operations.
 In 1972, Loran engaged Joseph T. McDonald as his personal accountant. After the incorporation of GFPS in 1974, McDonald was retained as the company's accountant until 1983. During this period, McDonald and his company, J. McDonald and Co., Ltd. ("McDonald and Company"), gained the Garvins' trust and confidence.
 
 
 1
 On March 2, 1982, Loran received an unsolicited telephone call from McDonald. During the conversation, McDonald told Loran about the possibility of obtaining a $3.9 million sprinkler contract for GFPS. An oil refinery was about to be built south of Phoenix in Mobile, Arizona which would be needing the installation of a fire sprinkler system. McDonald said some investment in the project might be required to obtain the sprinkler contract and invited Loran to attend a meeting at his office the next day.
 
 
 2
 Loran and GFPS's controller, Jerry Oberzut, attended the meeting at McDonald's office. At the meeting, Loran and Oberzut were introduced to James A. Barnes, head of the management consulting department at McDonald and Company, and to John A. Greenbank, the general partner of RHC. Barnes and Greenbank gave Loran and Oberzut an "information memorandum" on RHC, the personal financial statement of John and Bonnie Greenbank, and other promotional material prepared by McDonald and Company. The information memorandum contained general representations concerning the status of construction on the project.[1] The Greenbank's personal financial statement, prepared by McDonald and Company, put their net worth at $14,521,485 as of January 31, 1982.[2]
 
 
 3
 As the meeting progressed, Loran and Oberzut were told RHC, an Arizona limited partnership formed solely to acquire five units of participation in Provident Oil Refining Company ("Provident"), was offering for sale 25 units of participation in RHC. Each unit of participation represented a 2% interest in the RHC partnership. Greenbank retained the remaining 50% interest in RHC. Provident was to be formed as a limited partnership to own and operate the refinery. The five units of participation in Provident would represent a 5% interest in the oil refinery. The units of RHC were offered to the Garvins at a price of $120,000 per unit. Loran was asked to commit to the purchase of four units by March 8, 1982, in exchange for the $3.9 million sprinkler contract. As an additional inducement to invest, Greenbank agreed to buy back the four units of participation in RHC if GFPS did not get the sprinkler contract within 90 days.
 
 
 4
 After the meeting, Barnes sent Oberzut additional documentation which characterized a January 27, 1982 letter from a company called Planco as a firm commitment for the financing of Provident in the amount of $360 million, and a "Refinery Holding Company Unit Appraisal," which concluded the cost of $120,000 per unit provided a "significant range for substantial profit."[3]
 
 
 5
 The morning of March 8, Loran met with Oberzut to discuss the Planco letter and the unit appraisal. Relying on these documents and representations McDonald made about RHC's and Greenbank's financial strength, Loran received permission from Carroll, in California, to act on his behalf.
 
 
 6
 That afternoon, at a follow-up meeting in McDonald's office, Loran committed himself and his brother to the purchase of four units of participation in RHC at a price of $480,000.
 
 
 7
 Prior to the purchase, no one at McDonald and Company disclosed to the Garvins either the existence or extent of McDonald's fee arrangement with Greenbank. It was only after investing that the Garvins learned the extent of the fee arrangement between McDonald and Company and Greenbank. Although there was no written fee agreement between them, Greenbank paid $117,500 to McDonald and Company for services rendered to RHC, from February 8, 1982 to April 23, 1982. The Company did not bill Greenbank on an hourly basis; instead, each billing followed closely an investment generated by the marketing efforts of the Company. Moreover, in June 1982, Provident committed itself to a new fee agreement with the Company which exceeded $1.5 million.
 
 
 8
 McDonald represented the refinery project as under way. After investing, the Garvins learned work on the project had not really begun. The acreage in Mobile had only been cleared and fenced. No working drawings of the project had been completed by March 1982. Provident's success depended upon obtaining $500 million in funding. Although the project managers had tried since 1978, their fund raising efforts were unsuccessful; and as of December 1981--three months before McDonald solicited Loran's investment--Provident was insolvent. GFPS never received the $3.9 million sprinkler contract, nor did Greenbank buy back the units of participation in RHC. By 1984, the refinery, unable to pay its creditors, closed its doors. In December 1985, the project filed for Chapter 11 reorganization under the Federal Bankruptcy Code.
 
 
 9
 After discovering the true condition of Provident, the Garvins filed suit against Greenbank, Barnes, McDonald, and his company. In their complaint, the Garvins alleged separately and in combination fraud, negligence, consumer fraud, civil racketeering, malpractice or negligence and breach of fiduciary duty, and conspiracy to defraud. Prior to submission to the jury, the Garvins elected not to proceed on the consumer fraud, conspiracy to defraud, and the common law fraud counts. The jury returned a verdict for the Garvins on February 21, 1986, and entered a special interrogatory finding the appellees liable on the Arizona civil racketeering counts.
 
 
 10
 On March 11, 1986, the appellees filed a motion for a JNOV or, in the alternative, for a new trial or remittitur. The district court postponed its decision on the motion until the Arizona Supreme Court reviewed, or declined to review, Sullivan v. Metro Productions, Inc., 150 Ariz. 573, 724 P.2d 1242 (Ct.App.1986), cert. denied, 479 U.S. 1102, 107 S.Ct. 1334, 94 L.Ed.2d 185 (1987), in which the Arizona Court of Appeals held the application of treble damages for a civil racketeering violation is not discretionary. The Arizona Supreme Court declined to review Sullivan on September 9, 1986.
 
 
 11
 More than a year after the jury verdict, on March 4, 1987, the district court granted in part and denied in part the appellees' motion. The court granted the JNOV on the Arizona civil racketeering claims but denied the request for a new trial and the JNOV on damages with respect to other counts conditioned on the appellants' acceptance of remittitur. The appellants accepted the remittitur and on May 20, 1987, filed this appeal challenging the district court's order granting a JNOV on the Arizona civil racketeering claims. On June 2, 1987, the appellees filed a cross-appeal challenging the denial of a JNOV on damages.
 
 STANDARD OF REVIEW
 
 12
 We review the propriety of a JNOV under the standard applied by the district court. Peterson v. Kennedy, 771 F.2d 1244, 1252 (9th Cir.1985), cert. denied, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986). A "JNOV is proper when the evidence permits only one reasonable conclusion as to the verdict." Wilcox v. First Interstate Bank of Oregon, N.A., 815 F.2d 522, 525 (9th Cir.1987). If the evidence, considered as a whole in a light most favorable to the nonmoving party, can support only one reasonable conclusion, then the moving party is entitled to a judgment notwithstanding the adverse verdict. Id. "Neither the district court nor this court is free to weigh the evidence or reach a result it finds more reasonable if the jury's verdict is supported by substantial evidence." Id.
 
 DISCUSSION
 
 13
 Racketeering in Arizona is characterized by the commission of certain unlawful enumerated predicate acts which are committed for financial gain. Jury instructions were given for two predicate acts, fraud in the purchase or sale of securities, A.R.S. Sec. 44-1991(2), and a scheme or artifice to defraud, A.R.S. Sec. 13-2310. These statutes become predicate acts in a civil racketeering action under A.R.S. Sec. 13-2301(D)(4) which provides in pertinent part:
 
 
 14
 "Racketeering" means any act, committed for financial gain, which is chargeable or indictable under the laws of the state in which the act occurred and, if the act occurred in a state other than this state, would be chargeable or indictable under the laws of this state had the act occurred in this state and punishable by imprisonment for more than one year, regardless of whether such act is charged or indicted, involving:
 
 
 15
 * * *
 
 
 16
 * * *
 
 
 17
 (r) Fraud in purchase or sale of securities.
 
 
 18
 * * *
 
 
 19
 * * *
 
 
 20
 (t) A scheme or artifice to defraud.
 
 
 21
 * * *
 
 
 22
 * * *
 
 
 23
 (1981) (Ariz.Sess.Laws 360, 361).
 
 
 24
 In State ex rel. Corbin v. Pickrell, 136 Ariz. 589, 667 P.2d 1304 (1983) the Arizona Supreme Court defined the requirements of A.R.S. Sec. 13-2301(D)(4) and discussed the difference between state and federal civil racketeering statutes. The petitioners had brought a special action alleging the trial judge abused his discretion in dismissing, for failure to state a claim, civil racketeering counts which failed to allege a special "racketeering injury." Id. at 594, 667 P.2d at 1309. In comparing both state and federal civil racketeering statutes, the court found the Arizona Legislature intended RICO (Racketeer Influenced and Corrupt Organizations) to be a tool for combating white collar crime and for protecting its victims, such as the securities investor. Id. at 596, 667 P.2d at 1311. The Arizona version of RICO has a broader application than its federal counterpart: it does not require the involvement of an enterprise; it provides a direct remedy for an injured plaintiff; and it does not require any special "racketeering injury." Id. at 595, 667 P.2d at 1310. All a plaintiff need allege is an injury arising out of the commission of a predicate act, that the predicate act was committed for financial gain, and that the predicate act is chargeable under the laws of the state and punishable by imprisonment for more than one year. Id.
 
 
 25
 In the instant case, the district court in granting the JNOV found the evidence of civil racketeering insufficient in two respects. First, the appellants failed to prove the appellees had the mental state required for the two predicate acts for which jury instructions were given; and second, the appellants failed to prove appellees' conduct was "for financial gain."
 
 
 26
 A. Fraud in the Purchase or Sale of Securities
 
 
 27
 The appellants allege the appellees committed fraud in the purchase or sale of securities as defined by A.R.S. Sec. 44-1991(2) which provides:
 
 
 28
 It is a fraudulent practice and unlawful for a person, in connection with a transaction or transactions within or from this state involving an offer to sell or buy securities, or a sale or purchase of securities, including securities exempted under Sec. 44-1843 or 44-1843.01 and including transactions exempted under Sec. 44-1844, directly or indirectly to do any of the following
 
 
 29
 * * *
 
 
 30
 * * *
 
 
 31
 2. Make any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.
 
 
 32
 * * *
 
 
 33
 * * *
 
 
 34
 A.R.S. Sec. 44-1991(2) (1987). Appellants argue appellees' violation of A.R.S. Sec. 44-1991(2) constitutes a predicate act under A.R.S. Sec. 13-2301(D)(4)(r) without any level of scienter, and that the court erred in imposing a scienter requirement on the statute where none exists. Appellants argue both A.R.S. Sec. 44-1991(2) and A.R.S. Sec. 13-2301(D)(4)(r) are strict liability statutes. Although appellees concede A.R.S. Sec. 44-1991(2) does not expressly require scienter, they argue that without some level of scienter, their conduct does not constitute a violation of fraud in the purchase or sale of securities as required by Arizona's RICO statute.
 
 
 35
 The district court based its finding that scienter is required on an Arizona Supreme Court case, State v. Gunnison, 127 Ariz. 110, 618 P.2d 604 (1980). The Gunnison court held scienter is required for a violation of the crime of conspiracy to violate A.R.S. Sec. 44-1991(2). Although the statute made no reference to intent, the court found:
 
 
 36
 The crime of conspiracy has been widely regarded as involving a consciously criminal agreement and is for that reason blameworthy and punishable in itself: conspiracy imports a corrupt agreement between not less than two with guilty knowledge on the part of each.
 
 
 37
 Id. at 113, 618 P.2d at 607 (quoting Morrison v. California, 291 U.S. 82, 54 S.Ct. 281, 78 L.Ed. 664 (1934)). In the instant case, the district court in granting the JNOV extended this holding beyond conspiracy to commit a violation of A.R.S. Sec. 44-1991(2) to any criminal violation of the statute itself. To qualify as a predicate act under A.R.S. Sec. 13-2301(D)(4), each act listed must be punishable by imprisonment; therefore, the court observed the act must be a criminal as opposed to a civil violation of the statute. The court concluded a mere showing of civil negligence would be inadequate when the alleged violation must qualify as a predicate act in a civil racketeering action.
 
 
 38
 The violation of A.R.S. Sec. 44-1991(2) alleged in Gunnison occurred in 1975. At that time the statute was made criminal by A.R.S. Sec. 44-2036(A).[4] The criminal penalty in A.R.S. Sec. 44-2036(A) provided punishment only for a willful violation of A.R.S. Sec. 44-1991(2). "Willful" as used in A.R.S. Sec. 44-2036(A) has been defined by the Arizona Court of Appeals as follows:
 
 
 39
 "Willfully," when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act, or make the omission referred to. It does not require any intent to violate law, or injure another or to acquire any advantage.
 
 
 40
 State v. Tarzian, 136 Ariz. 238, 241, 665 P.2d 582, 585 (Ct.App.1983). Prior to 1978, the distinctions made by the court in Gunnison were valid. A.R.S. Sec. 44-1991(2) was a strict liability statute for civil offenses and in criminal prosecutions some scienter was required. Changes in Arizona law since 1978, however, have eliminated this distinction. In 1978, A.R.S. Sec. 44-2036 was renumbered and the language was changed.[5] With this change, the statute no longer provides the penalty for A.R.S. Sec. 44-1991. Instead, the penalty is set forth in A.R.S. Sec. 44-1995 in which there is no reference to any level of scienter.[6]
 
 
 41
 A.R.S. Sec. 13-202(B), enacted in 1978, addresses the level of scienter necessary when a statute defining a criminal offense--such as A.R.S. Sec. 44-1991--does not expressly proscribe the mental state required. The statute requires no culpable mental state: "the offense is one of strict liability unless the proscribed conduct necessarily involves a culpable mental state." A.R.S. Sec. 13-202(B) (1978).
 
 
 42
 In Rose v. Dobras, 128 Ariz. 209, 624 P.2d 887 (Ct.App.1981), the Arizona Court of Appeals discussed the elements necessary to establish a violation of A.R.S. Sec. 44-1991(2). The court found the "presence of the nine elements of common law fraud are not essential to establishing a violation of this section." Id. at 214, 624 P.2d at 892. Scienter is not an element of a violation of this section. Id. "It is not necessary for the seller to have intentionally misstated material facts or to have intentionally omitted any material facts in order for A.R.S. Sec. 44-1991(2) to apply." Id. The standard for materiality of omitted or misstated facts contemplates a "showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable [buyer]." Id. A seller of securities is strictly liable for the misrepresentations or omissions he makes. The Arizona Court of Appeals has held:
 
 
 43
 The statutes do not require investors to act with due diligence ... To the contrary, defendants have an affirmative duty not to mislead potential investors. This requirement not only removes the burden of investigation from an investor, but places a heavy burden upon the offeror not to mislead potential investors in any way.
 
 
 44
 Trimble v. American Sav. Life Ins. Co., 152 Ariz. 548, 553, 733 P.2d 1131, 1136 (Ct.App.1986).
 
 
 45
 The information memorandum, the Greenbanks' personal financial statement, and the nondisclosure of pertinent fee arrangements between McDonald and Company and Greenbank contain misrepresentations or omissions which the jury could have reasonably determined met the standard of materiality required by A.R.S. Sec. 44-1991(2). Thus there is abundant evidence from which the jury could have determined the appellees committed fraud in the purchase or sale of securities as defined by A.R.S. Sec. 44-1991(2). In light of the changes in Arizona law since 1978, scienter is neither required for a criminal violation of A.R.S. Sec. 44-1991(2) nor necessary for the statute to qualify as a predicate act in an Arizona civil racketeering action. Therefore, we find the district court erred in its determination that a violation of A.R.S. Sec. 44-1991(2) requires a showing of scienter before it can qualify as a predicate act.B. Fraudulent Scheme or Artifice
 
 
 46
 Appellants allege appellees committed a second predicate act, under A.R.S. Sec. 13-2301(D)(4)(t), a scheme or artifice to defraud. The jury was instructed that a scheme or artifice to defraud, as a predicate act, is defined by A.R.S. Sec. 13-2310 (Supp.1987). This statute provides:
 
 
 47
 Any person who, pursuant to a scheme or artifice to defraud, knowingly obtains any benefit by means of false or fraudulent pretenses, representations, promises or material omissions is guilty of a class 2 felony.
 
 
 48
 Reliance on the part of any person shall not be a necessary element of the offense described in subsection A of this section.
 
 
 49
 This statute replaced A.R.S. Sec. 13-320.01 which was repealed in 1976.[7] In its new form, the intent language was changed from "knowingly and intentionally" to simply "knowingly." The Arizona Supreme Court has interpreted this change. In State v. Bridgeforth, 156 Ariz. 60, 63, 750 P.2d 3, 6 (1988), the court held the language change in A.R.S. Sec. 13-2310 shifted the focus of the culpable mental state of the offender from knowingly and intentionally to just knowingly. The court stated:
 
 
 50
 Giving effect to all of the language used in the statute, we hold that in all cases, in order to convict a person of violating A.R.S. Sec. 13-2310, the state must prove:
 
 
 51
 1) that a plan or scheme existed;
 
 
 52
 2) that the purpose of such plan or scheme was to defraud others;
 
 
 53
 3) that, knowing the purpose of the scheme, the defendant pursuant to the scheme obtained a benefit;
 
 
 54
 4) by means of false pretenses, representations, promises or material omissions.
 
 
 55
 Id. at 64, 750 P.2d at 7.
 
 
 56
 The person charged is not required to have devised the scheme. Id. "The statute is violated by one who makes false representations to obtain a benefit with knowledge of the fraudulent scheme and in furtherance of it." Id. The scheme need not be fraudulent on its face but must involve fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension. Id. at 63, 750 P.2d at 6; see also State v. Haas, 138 Ariz. 413, 418, 675 P.2d 673, 678 (1983). Fraudulent representations may be effected by half truths, deceitful statements or the concealment of material facts. Bridgeforth, supra; Haas, id.
 
 
 57
 Appellees argue there is no evidence of a scheme or artifice to defraud. The record, however, contains sufficient evidence for the jury to have concluded reasonably that there was a scheme by which the appellees knowingly defrauded the appellants for their benefit using "false pretenses, representations, promises or material omissions."
 
 
 58
 The jury could have reasonably concluded a plan or scheme existed to solicit and mislead appellants into investing in an insolvent venture. The Planco letter, the Greenbanks' personal financial statement, the information memorandum, Greenbank's promise to buy back the RHC units, the $3.9 million sprinkler contract, and the failure to disclose the fee agreements were fraudulent representations, promises, or omissions used by the appellees to deceive the appellants. The jury could have found the active solicitation and presentation of this fraudulent material was knowing and in furtherance of a financial benefit, not the honest solicitation of an investment in a business which eventually failed. The court in Bridgeforth noted the distinction between an unwise investment in a failing business and fraud.
 
 
 59
 There is nothing illegal about a business failing and customers losing deposits. The bankruptcy courts consider thousands of such unfortunate occurrences. It is quite another matter if a business receives money based on promised performance which was never intended to be carried out. That is fraud.
 
 
 60
 Id. 156 Ariz. at 64, 750 P.2d at 7.
 
 
 61
 The record contains sufficient evidence for the jury to have found the appellees knowingly conducted a scheme or artifice to defraud as defined by A.R.S. Sec. 13-2310, and that this violation constitutes a predicate act in a civil racketeering action under A.R.S. Sec. 13-2301(D)(4)(t).
 
 C. Financial Gain
 
 62
 Appellants contend the district court erred in finding the evidence of financial gain was insufficient. We agree.
 
 
 63
 The record contains ample and persuasive evidence from which the jury could reasonably have determined the appellees' conduct was committed "for financial gain." The district court found that a "commission agreement" could not be inferred from the evidence. We disagree. The record clearly indicates the appellees were directly and bounteously rewarded for their efforts. The active marketing, promotion, and sale of units of participation in RHC by the appellees resulted in not only the $480,000 invested by the appellants, but an additional substantial sum from other investors. This amount not only resulted in financial gain to Greenbank, the owner of 50% of RHC, but also to McDonald and Company which received $117,500 through a fee arrangement with Greenbank. This fee arrangement depended on a combination of an hourly rate and a contingency for success. Without the misrepresentations, omissions, and false promises, this scheme would not have been successful. There would not have been any financial gain for Greenbank, and he would not even have been able to pay his first bill with the Company or later to negotiate a new agreement for $1.5 million.
 
 CONCLUSION
 
 64
 The evidence considered in a light most favorable to the appellants is sufficient to support the jury's finding that the appellees committed fraud in the purchase or sale of securities as defined by A.R.S. Sec. 44-1991(2), that they devised a scheme or artifice to defraud as defined by A.R.S. Sec. 13-2310, and that they committed these acts for financial gain. Both are felonies punishable by more than one year in prison pursuant to A.R.S. Sec. 13-701. The record therefore sustains the verdict of the jury which, by a special interrogatory, found liability on the part of the appellees for racketeering as provided by A.R.S. Sec. 13-2301(D)(4).
 
 
 65
 The record gives every indication that the court mistakenly substituted its judgment for that of the jury.[8] In so doing, the court improperly deprived appellants of the benefit of stern measures enacted by the Arizona legislature to combat fraud and racketeering. We hold the district court erred in entering a JNOV as to these claims, and appellants are entitled to treble damages. We remand for a calculation of damages, costs and attorney's fees under Sullivan as provided by A.R.S. Sec. 13-2314(A).[9]
 
 CROSS-APPEAL
 
 66
 Appellees argue the district court erred in not granting their motion for a JNOV in its entirety. A motion for JNOV, on the ground a jury verdict is not supported by substantial evidence, is addressed to the sound discretion of the trial court. Raynor Bros. v. American Cyanamid Co., 695 F.2d 382, 385 (9th Cir.1982). We review the evidence in "a light most favorable to the party against whom the judgment would be granted and all inferences must be drawn in that party's favor." Kay v. Cessna Aircraft Co., 548 F.2d 1370, 1372 (9th Cir.1977).
 
 
 67
 The jury awarded $772,000 in damages to the appellants for their federal securities claim. The award was composed of the appellants initial investment in RHC of $480,000 plus prejudgment interest of $292,000. The district court conditioned the denial of appellees' motion for JNOV as to these damages upon the acceptance by the appellants of remittitur of the prejudgment interest. The appellants accepted the remittitur, and do not challenge it now.
 
 
 68
 The appellees argue the district court's award was not based upon substantial evidence. The jury was instructed on an out-of-pocket measure of damages. Under the general rule for out-of-pocket damages, "a plaintiff may recover the difference between the value of the consideration paid and the value of the securities received, plus consequential damages that can be proven with reasonable certainty to have resulted from the fraud." Volk v. D.A. Davidson & Co., 816 F.2d 1406, 1413 (9th Cir.1987). Appellees argue the appellants made no effort to establish the value of the investment on the date the appellants purchased the units of RHC; therefore, an award determined using an out-of-pocket measure could not be based on substantial evidence.
 
 
 69
 Damages need not be proven to a mathematical certainty. Harmsen v. Smith, 693 F.2d 932, 945 (9th Cir.1982), cert. denied, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983). Sufficient evidence must be introduced so that the court can arrive at an intelligent estimate without speculation and conjecture. Id. It is for the judge, after becoming aware of the nature of the case, to determine the appropriate measure of damages. Arrington v. Merrill Lynch, Pierce, Fenner & Smith, 651 F.2d 615, 621 (9th Cir.1981).
 
 
 70
 The district court found the record contained sufficient evidence to determine the units were worthless when purchased. The court found the jury may have believed the units of RHC were worthless based on the evidence that 1) the appellants failed to receive any income or return on their investment for nearly four years; 2) the project failed to gain the requisite financing; 3) the project failed to obtain the necessary crude oil supply; and 4) Provident filed Chapter 11 bankruptcy proceedings in December 1985. The jury may also have inferred from the evidence that since Provident had been insolvent since 1981, any value in the refinery property, or Alaska permits, would be negligible with respect to the appellants.
 
 
 71
 The record, thus, contains sufficient evidence for the jury to have found the units of participation in RHC to be worthless when purchased by the appellants. Accordingly, we affirm the award of damages by the district court on the federal securities claims in the amount of $480,000 for the appellants.
 
 
 72
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 
 [1]
 The information memorandum described Provident Oil Refining Company as a $400 million project and made specific representations that debt financing of $400 million had been obtained
 
 
 [2]
 Unknown to the Garvins, the diversion of funds into the refinery project plus other business and financial expenses had created financial difficulties for Greenbank. Early in 1982, Barnes was openly concerned about Greenbank's ability to pay his bill at J. McDonald & Co., Ltd. Barnes also knew the fair market value of the oil refinery reflected in Greenbank's financial statement was less than the $100 million stated
 
 
 [3]
 The Planco letter was actually not a firm commitment for financing as the Garvins were led to believe. The refinery project never received a firm commitment for financing
 
 
 [4]
 A.R.S. Sec. 44-2036(A) (repealed 1978) set forth:
 A person who willfully violates any provision of Secs. 44-1841, 44-1842, or article 13 of this chapter, is guilty of a felony punishable by a fine of not less than five hundred nor more than five thousand dollars, by imprisonment for not less than one nor more than ten years, or both.
 
 
 [5]
 A.R.S. Sec. 44-2040 provides:
 A person who knowingly violates any provision of this chapter or any rule, regulation or order of the commission thereunder for which a penalty is not provided is guilty of a class 1 misdemeanor.
 
 
 [6]
 A.R.S. Sec. 44-1995 provides:
 A person violating a provision of this article is guilty of a class 4 felony.
 
 
 [7]
 A.R.S. Sec. 13-320.01 (repealed 1976) provided:
 Any person who, pursuant to a scheme or artifice to defraud, knowingly and intentionally obtains or attempts to obtain money, property or any other thing of value by means of false or fraudulent pretenses, representations or promises is guilty of a felony punishable by imprisonment in the state prison for not more than twenty years, by a fine not to exceed twenty thousand dollars, or both.
 
 
 [8]
 In the order granting the JNOV, the court indicated its dislike under these circumstances of a mandatory treble damages provision:
 The defendants request that the Court exercise its discretion to refrain from the harsh remedy of treble damages provided for under the Arizona Racketeering Statute. This court agrees that treble damages are an excessively harsh remedy under the particular circumstances of this case. If this Court had discretion with respect to the award of treble damages, it would deny treble damages.
 
 
 [9]
 A.R.S. Sec. 13-2314(A) provides in part:
 A person who sustains injury to his person, business or property by racketeering as defined by Sec. 13-2301, subsection D, paragraph 4 or by a violation of Sec. 13-2312 may file an action in superior court for the recovery of treble damages and the costs of the suit, including reasonable attorney's fees.